[Crim. No. 7985.   In Bank.   Oct. 29, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. JOE RAMOZ CRUZ, Defendant and Appellant.

Jerrold E. Levitin and Benjamin M. Davis for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Albert W. Harris, Jr., and Michael R. Marron, Deputy Attorneys General, for Plaintiff and Respondent.

SCHAUER, J.*—Defendant appeals from a judgment of conviction of possession of marijuana. (Health & Saf. Code, § 11530.) The sole contention we need reach is that defendant was convicted on evidence obtained (in a material part) as a result of an illegal search and seizure in violation of the constitutional guarantees (U.S. Const., 4th and 14th Amends.; Cal. Const., art I, § 19) and admitted at the trial over defendant's timely objections. We have concluded that under the controlling federal and California law the challenged evidence was inadmissible; that on the record of this case its admission was prejudicial error (Cal. Const., art. VI, § 4½); and hence that the judgment should be reversed.

An informer, previously shown to be reliable and whose name was disclosed at the trial, told State Narcotics Agent

---

*Retired Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Van Raam that a man named "Joe" would pick up a girl named "Suzy" at Pierre's Tavern in San Francisco and drive to Los Angeles or Mexico to obtain marijuana; the informer also gave a description of the car to be used, and its license number. Agent Van Raam went to Pierre's Tavern and observed defendant and a girl, later identified as Ann Dominguez, drive up in the described car and meet another girl, later identified as Susan LeFevre. The officer followed defendant's car to an apartment building on Dolores Street, where defendant and the two girls entered and emerged with two suitcases, then drove away.

Agent Van Raam followed them as far as Livermore, broke off surveillanec at that point, returned to the area on Dolores Street, and made a fruitless attempt to determine which building defendant and the girls had entered. Failing to identify the building, he continued to watch the general vicinity for defendant's car. Some eight days later, at about 10 a.m., Agent Van Raam saw defendant's car parked on Dolores Street in the area under surveillance. The officer took no direct action at that time, but returned at 1 p.m. with two federal narcotics agents. Defendant was sitting behind the wheel of his car, parked in the same place on the street. The officers double-parked next to defendant and identified themselves. Defendant lunged across the seat, away from the officers, and put an object in his mouth that appeared to one officer to be a marijuana cigarette and to the other to be "a piece of white paper" that "looked like a cigarette." One of the federal officers then seized defendant while Agent Van Raam grasped defendant's jaw and attempted to force his mouth open; the officer testified that in so doing he placed his fingers "in between his two bones, between the teeth, and pressed." Defendant, however, spat nothing out. The officers then arrested defendant, handcuffed him, and removed him to the federal car.

During the struggle defendant shouted the name "Ann" several times, and Ann Dominguez emerged from an apartment building at 380 Dolores. Agent Van Raam testified that he identified himself and told her he had just arrested defendant; that he pointed to the open door of apartment B at 380 Dolores and asked her, "Is that your place?" and that she replied in the affirmative; that he then said, "Well, why don't we go upstairs and talk about it?" and that she answered, "O.K."

Meanwhile, the federal agents parked around the corner

and asked defendant for his identification. He referred them to his billfold, in which the officers found defendant's address to be different from that of the Dolores Street apartment. Being questioned, defendant explained that "I don't live in this area."

The federal agents then took defendant into apartment B, where the above mentioned Agent Van Raam was waiting with Ann Dominguez and Susan LeFevre. Van Raam asked who lived there, and the girls replied that they did, together with a girl named Sharon Ferguson; Van Raam then asked who paid the rent, and was told that Sharon and Susan did, and that defendant and Ann were just staying there as guests while looking for a new apartment of their own. The officer asked "if they mind if I looked around, and they [i.e., Ann and Susan] said, 'No. Go ahead.' " Defendant did not join in this expression of consent, and throughout the ensuing search remained silent, handcuffed and under guard in the front room.

The search was an extensive one, lasting approximately two and one-half hours. Agent Van Raam testified that he made a "thorough" search of each of the six or more rooms of the apartment, examining "every possible place that there was that conceivably narcotics may have been concealed [in]." Since the occupants were preparing to move, there were suitcases and boxes in each room and in the hallway; Agent Van Raam asked Ann, "Who does all this stuff belong to?" and she replied that some was hers and the rest belonged to Susan and to "several people." Without further identification of the owner of each piece Van Raam proceeded to open and search all the suitcases and boxes in turn. When he came to a small blue suitcase (People's Ex. 7) he opened it and did not ask Ann whose it was until after he had searched it. She then told him that it belonged to defendant; inside, among men's toilet articles, the officer found a package containing marijuana seeds and debris.

The discovery of the contraband was made, according to Van Raam's testimony, at "a little before 2:30 [p.m.]"; nevertheless the officer continued the search for another one and one-half hours. He did not confront defendant with the blue suitcase until they were leaving at "five minutes to 4:00," whereupon defendant readily admitted that the suitcase was his. Van Raam sought to explain this delay by testifying that he "would like to collect all the evidence that I may find there and present it to [defendant] at one time." The officer testified further that upon their return to the Narcotics

Bureau defendant admitted owning the marijuana found in the blue suitcase; defendant denied having made such an admission.

■ Defendant made out a prima facie case of the illegality of his arrest and the search and seizure of the blue suitcase and its contents when he established that they were made without a warrant. The burden then rested on the prosecution to show proper justification. (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [5] [294 P.2d 23], and cases there cited.)

■ The showing made to justify defendant's arrest is sufficient. An arrest upon information supplied by a reliable informer is valid. (*People* v. *Prewitt* (1959) 52 Cal.2d 330, 336 [7] - 337 [12] [341 P.2d 1].) Here there was the additional factor of defendant's actions when he was accosted by the officers: i.e., he immediately lunged away from them, thrust what appeared to be a marijuana cigarette into his mouth, swallowed, and effectively resisted all efforts to recover it. On the basis of such conduct, together with the information previously acquired, the officers could reasonably have believed that defendant had committed the felony of possession of marijuana. Accordingly, they had reasonable cause to arrest him without a warrant. (Pen. Code, § 836, subd. 3.)

■ At the trial the prosecution sought to justify the search and seizure of the blue suitcase and its contents on the ground that the search was incidental to the valid arrest of defendant. That arrest, however, was not effectuated *on the premises thereafter searched,* but in a car parked on a public street. It follows that the search was not in fact "incidental to" defendant's arrest under the settled construction of that phrase by the federal and California courts, for " 'it was at a distance from the place thereof and was not contemporaneous therewith.' " (*People* v. *King* (1963) 60 Cal. 2d 308, 311 [4] [32 Cal.Rptr. 825, 384 P.2d 153]; see also *Agnello* v. *United States* (1925) 269 U.S. 20, 30-31 [46 S.Ct. 4, 70 L.Ed. 145, 148, 51 A.L.R. 409, 412-413]; *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 67 [2] [27 Cal.Rptr. 889, 378 P.2d 113]; *People* v. *Gorg* (1955) 45 Cal.2d 776, 781 [9] [291 P.2d 469].)

It is urged, however, that the search should be held to be "incidental to" the arrest because the car wherein defendant was arrested was parked only "A few feet south of the address, perhaps one door or two doors below" the apartment house in question. But while a search incidental to an arrest

"may, under appropriate circumstances, extend beyond the person of the one arrested to include the premises under his immediate control" (*Harris* v. *United States* (1947) 331 U.S. 145, 151 [67 S.Ct. 1098, 91 L.Ed. 1399, 1406]), it is manifest that at the time of the arrest in the case at bench the automobile in which defendant was apprehended was the only "premises [property] under his immediate control" within the meaning of this rule. Even a house owned or rented by the person subsequently charged cannot be searched without a warrant "except as an incident to a lawful arrest therein" (*Chapman* v. *United States* (1961) 365 U.S. 610, 613 [81 S.Ct. 776, 5 L.Ed.2d 828, 831], quoting from *Agnello* v. *United States* (1925) *supra,* 269 U.S. 20, 32 [46 S.Ct. 4, 70 L.Ed. 145, 149]) ; *a fortiori,* the search of an apartment where the subject defendant was at most a non-present guest cannot be justified by an arrest that was not made on the premises. It is true that in *Agnello, Tompkins,* and the other cases cited hereinabove, the arrest took place several blocks or more from the premises thereafter searched; it is also true that the closer the arrest is to the premises, the more arbitrary this rule may tend to appear. But this is only an appearance of arbitrariness, a phenomenon that often occurs as differing fact situations arise and approach a line drawn by the law. The rule itself is sound and, above all, workable (see *People* v. *Cahan* (1955) 44 Cal.2d 434, 451 [9] [282 P.2d 905, 50 A.L.R.2d 513]), and should serve to guide law enforcement officers as they conscientiously seek to perform their duty within the ambit of the constitutional guarantees. ■ To abide by the rule ourselves (and to clarify it for those who must work under it in the field) we are constrained to hold that a search is not "incidental to an arrest" unless it is limited to the premises where the arrest is made; is contemporaneous therewith; has a definite object; and is reasonable in scope.

■ Nor can the search in the case at bench be justified on the ground of consent. Before undertaking the search the officers had learned that defendant and Ann were merely transient guests in the apartment. The officers had neither asked for nor received defendant's consent, express or implied, to search through any of his belongings on the premises. The general consent given by Ann and Susan that the officers could "look around" did not authorize Agent Van Raam to open and search suitcases and boxes that he had been informed were the property of third persons. This is not a case

where the officer made "a reasonable mistake as to the extent of the owner's authority" over the property. (*People* v. *Gorg* (1955) *supra*, 45 Cal.2d 776, 783 [17].) Rather, as the trial court correctly observed, "This young lady [Ann] couldn't give consent to open boxes, jewel boxes, or suitcases, or anything else that weren't hers, and the officer testified that they indicated to him that this conglomeration of goods that was there, belonged to several persons, beyond the two girls to whom he was talking.

"Therefore, as to any particular suitcase before he opened it, he should have said, 'Is this yours? Can I look into it?' or, 'Does this belong to the man [i.e., defendant], or somebody else?' "

Agent Van Raam failed to make such simple inquiries, but instead carried out a general exploratory search of (as he described it) "every possible place that there was that conceivably narcotics may have been concealed [in]." It follows that the search and seizure of defendant's blue suitcase and its contents cannot be sustained on consensual grounds, and its admission into evidence over defendant's timely objections was error under both federal and state law. (*Holzhey* v. *United States* (5th Cir. 1955) 223 F.2d 823, 825 - 827 [2] ; *United States* v. *Blok* (D.C. Cir. 1951) 188 F.2d 1019, 1020 [2] - 1021 [7] ; see also *Tompkins* v. *Superior Court* (1963) *supra*, 59 Cal.2d 65, 68 [5] - 69 [6], and cases there cited.)

Such an error, however, will not result in reversal unless on the entire record of the case the reviewing court concludes that a miscarriage of justice has ensued. (*People* v. *Parham* (1963) 60 Cal.2d 378, 385-386 [6] [33 Cal.Rptr. 497, 384 P.2d 1001] ; *People* v. *Tarantino* (1955) 45 Cal.2d 590, 595, 597 [290 P.2d 505] [judgment of conviction affirmed on count as to which admission of illegally obtained evidence was not prejudicial, reversed on counts as to which admission of such evidence was prejudicial].) Here the Attorney General argues that "even if the seizure of the marihuana in the apartment be questioned, enough contraband was discovered in the trunk of [defendant's] automobile to sustain this conviction."[1] But throughout the examination of the witnesses

---

[1]After leaving the apartment the officers searched defendant's car. Finding no narcotics in the passenger compartment, Agent Van Raam obtained the keys from defendant's pocket, unlocked the trunk, and found a brown suitcase (People's Ex. 8) which he then pried open. Inside were marijuana cigarettes and debris. Defendant denied owning this suitcase or its contents, and said they belonged to a person subse-

and his argument to the jury the prosecutor laid preponderant emphasis on the importance of the blue suitcase and its contents. His stated reason for doing so was that whereas defendant denied owning the brown suitcase he assertedly had admitted that the marijuana found in the blue suitcase was his, and hence "it becomes crucial, of course, to take advantage of the admission of the [latter] possession." There is no reason why we should treat this evidence as any less "crucial" than the prosecutor—and so presumably the jury—treated it. After a review of the entire cause, including the evidence, we are of the opinion that it is reasonably probable that a result more favorable to defendant would have been reached if the subject evidence had not been erroneously admitted against him. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [12] [299 P.2d 243].)

The judgment is reversed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Dooling, J.,* concurred.

---

quently admitted to be fictitious. As the officers knew, defendant had purchased this car from one Paul McCabe three weeks earlier; defendant explained on the witness stand that he gave the fictitious name in order to protect McCabe from possible trouble with the police.

*Retired Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.