[Crim. No. 10089.   Second Dist., Div. Four.   Dec. 10, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT GRASSO RODRIGUEZ et al., Defendants and Appellants.

David C. Marcus, Dahlstrum & Walton and Richard A. Walton for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—Defendants Rodriguez and Hernandez were charged by information with one count of violation of Health and Safety Code section 11500.5 (possession of heroin for sale) and a second count of violation of Health and Safety Code section 11530 (possession of marijuana). Each defendant pleaded not guilty and waived trial by jury. The court found defendants guilty on count I and not guilty on count II.

Both defendants are appealing from the judgment.

### Statement of Facts

On February 11, 1963, Officer Sanchez, a policeman assigned to the narcotics division of the Los Angeles police

department, was told by a tested and reliable informant that he had been present when defendant Rodriguez had taken delivery of 125 kilos of marijuana and 2 kilos of heroin. Rodriguez had told the informant that he never kept narcotics around his residence, that he kept a stash pad where he was going to take this shipment. Subsequently the informant, acting under police instructions, attempted to buy narcotics from Rodriguez. The informant was equipped with a transmitting device which enabled the police to overhear the conversations. They heard Rodriguez agree to sell a kilo of marijuana to the informant for $70, though no delivery was made. Later they heard Rodriguez say he had 200 ounces of heroin and a large amount of marijuana on hand, but he could not make delivery because the police were following him.

Rodriguez was under police surveillance from February 11 until the day of his arrest on November 14, 1963.

On November 13, 1963, Officer Sanchez saw Rodriguez drive to an apartment building on College View Drive in Monterey Park. Rodriguez entered apartment 26, remained inside for a short time, and then drove away. Sanchez then interviewed the manager and a neighbor who served as rental agent for the building. Sanchez was told that apartment 26 had recently been rented to a man whose description fitted Rodriguez, that the tenant did not stay in the apartment, and that the utilities had not been turned on. It was reported that the neighbors had observed candlelight in the apartment at night, and had not seen anyone move any clothing or other personal effects into the apartment. The rental agent also said that when Rodriguez came in to rent the apartment he was accompanied by another man, whom the agent described as tall, skinny and dark complected, with protruding teeth.

The following morning Officer Sanchez communicated this new information to Agent Cota of the state bureau of narcotic enforcement. At about 11 a.m. Cota went to the vicinity of the apartment and watched. About noon he saw Rodriguez, Hernandez and a female drive up. Rodriguez entered the apartment, remained briefly, and the three departed. Cota then called on the apartment manager and the rental agent, who gave him the same information they had given to Officer Sanchez. In addition he showed them a photograph of Rodriguez, which they identified as that of the man who had rented apartment 26.

Cota and Lieutenant Kennedy of the Los Angeles police

department kept the apartment under surveillance for the rest of the day. They assumed that the supply of narcotics was in apartment 26, and they had decided to arrest the next person who came out.

At about 7 p.m. Hernandez and Rodriguez drove up. While Rodriguez remained in the car Hernandez walked along a walkway which extended from the street back between the buildings to an outside stairway. He then climbed the stairs, took a key from his pocket and entered apartment 26. Before Hernandez entered the apartment Cota recognized him as the slender Mexican known as Bucktoothed Freddie, whom he had been watching a few weeks earlier as a suspected associate of Rodriguez. After Hernandez entered the apartment Cota moved closer to the foot of the stairs but remained hidden in the shadows. Three or four minutes later Hernandez came out, walked down the stairs and stepped on the walkway which passes between two apartment buildings. As Hernandez turned to walk towards the street Cota shouted "State narcotic agent. Stop."

Cota then stepped up to Hernandez and said "Freddie, how much stuff do you have on you?" He replied " 'Two pieces.' " A subsequent search revealed in Hernandez' coat pocket two rubber containers filled with powder.

While Hernandez was in the building Lieutenant Kennedy approached the automobile and arrested Rodriguez. Both defendants were found to be carrying keys to apartment 26. The officers then entered the apartment and found, behind the coils of the refrigerator, "a tinfoil package," within which were several rubber containers filled with powder. It is stipulated that the powder found in the refrigerator and that found in Hernandez' pocket weighed in the aggregate 343 grams and contained heroin.

Further search of the apartment revealed three measuring spoons, a milk sugar can and a magazine upon which there was a powder residue which a chemist found to be heroin.

The apartment, though furnished, contained no clothing, no food and no other personal effects except two magazines, a bottle of liquor and some toilet articles. The electric lights were not operative.

Rodriguez was asked if he had "any more stuff" at his house on Eagle Street and he replied " 'No, you can go search.' " At the Eagle Street residence marijuana was found.

The court received in evidence statements made by the two defendants when they were interrogated at police headquarters. Rodriguez' statement was that he and Hernandez had rented the apartment as a place to have parties. Hernandez' statement was that he had not known anything about the apartment until a friend named Ortiz had asked him to go there and pick up the stuff. He said he had asked Rodriguez to give him a ride, but that Rodriguez did not know anything about the apartment.

The trial court found that the verbal consent which Rodriguez gave for the search of his house on Eagle Street was not voluntary, and refused to receive the marijuana into evidence. For this reason both defendants were acquitted on the marijuana count.

## Sufficiency of the Evidence

■ The evidence is unquestionably sufficient to justify the arrests and to support the convictions on the charge of possession of heroin for sale.

The information from the tested informant, corroborated by what Officer Sanchez overheard, gave probable cause to arrest Rodriguez as early as February. The police reasonably suspected that Rodriguez was in business as a seller of narcotics on a large scale, that he maintained a storage facility somewhere, and that the apartment which they discovered on November 13 was such a place. When they learned that a man of Hernandez' description had been with Rodriguez when apartment 26 was rented, and when they saw Hernandez enter this apartment with his own key after having been brought there by Rodriguez, they were entirely justified in believing that Hernandez was in business with Rodriguez and that Hernandez was jointly in possession of the narcotics in the apartment. This reasonable belief constituted good cause for the arrest of both men. (*People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].)

■ Defendant Hernandez argues that the information which the police received in February and March was "stale" and should not justify an arrest in November. Counsel supports this theory by reference to cases holding that a search warrant may be issued only upon recent information. The two situations are not analogous. A search warrant issues upon a showing that contraband is presently to be found in a specified location, and for that reason an affidavit which does not show recent or current conditions is insuffi-

cient. But an arrest is appropriate whenever the officer has reasonable cause to believe that the person is guilty of a felony. Thus the knowledge that Rodriguez possessed heroin in February justified an arrest in November, the statute of limitations not having run on that offense. But this is not the sole rationale of the arrests. The information received in February and March, combined with the additional information received on November 13 and 14, together with the officers' own observations, gave them cause to believe that both men were committing a felony at the very time and place of the arrest.

■ The discovery of 343 grams of packaged heroin in an apartment which was under the joint control of the two defendants, and which was being used only as a storage place and not a residence, supports the finding that both defendants were guilty of the crime of possession for the purpose of sale.

### The Escobedo-Dorado Problem

■ Agent Cota's question "Freddie, how much stuff do you have on you?" cannot be regarded as "a process of interrogations that lent itself to eliciting incriminating statements" within the meaning of *People* v. *Dorado,* 62 Cal.2d 338, 353 [42 Cal.Rptr. 169, 398 P.2d 361], or *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. When we "analyze the total situation" (*People* v. *Stewart,* 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97]) it is obvious that Agent Cota was not then seeking a confession. Agent Cota was in the act of arresting Freddie; and was about to search his person regardless of what response he gave. If Freddie had any "stuff" the police would soon find out for themselves. The question was meaningless except as a form of salutation and it was of no consequence what kind of reply Freddie made.

■ Although the record is unclear as to the circumstances under which the defendants made their statements at police headquarters, there is enough in the record to require us to assume that there was an improper process of interrogation. (*People* v. *Luker,* 63 Cal.2d 464, 473 [47 Cal. Rptr. 209, 407 P.2d 9].) Even though Rodriguez' story is on its face exculpatory, it is subject to the exclusionary rule. (*People* v. *Hillery,* 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382].) But the error in receiving this evidence does not automatically require a reversal.

Rodriguez' statement to the police was substantially the same as the testimony which he gave from the witness stand, and which the trial court refused to believe. Hernandez' undeniable possession of the two packages of heroin in his pocket convincingly establishes his connection with the seven similar packages which were in the apartment from which he was emerging. Upon this record there is no reasonable possibility that defendants' statements to the police might have contributed to the convictions. (Cf. *Fahy* v. *Connecticut*, 375 U.S. 85, 86 [84 S.Ct. 229, 11 L.Ed.2d 171]; *In re Spencer*, 63 Cal.2d 400, 407 [46 Cal.Rptr. 753, 406 P.2d 33].)

### The Search of the Apartment

█ A more difficult question is whether it was proper to search apartment 26 as an incident to the arrest of Hernandez. Both the arrest and the trial took place before the opinion had come down in *People* v. *Cruz*, 61 Cal.2d 861 [40 Cal.Rptr. 841, 395 P.2d 889]. In the *Cruz* case police officers observed the defendant seated in a parked car. On the basis of reliable information that he had been transporting marijuana, they arrested him. Cruz struggled with the officers and shouted "Ann." When Ann emerged from an apartment which was "perhaps one or two doors" from where the car was parked, the officers entered Ann's apartment and made a search. There they found a suitcase belonging to Cruz, containing marijuana. In reversing, the Supreme Court said (at p. 865): "At the trial the prosecution sought to justify the search and seizure of the blue suitcase and its contents on the ground that the search was incidental to the valid arrest of defendant. That arrest, however, was not effectuated *on the premises thereafter searched,* but in a car parked on a public street. It follows that the search was not in fact 'incidental to' defendant's arrest under the settled construction of that phrase by the federal and California courts, for ' "it was at a distance from the place thereof and was not contemporaneous therewith." ' "

The Supreme Court concluded its discussion of the subject with these words (at p. 866): "To abide by the rule ourselves (and to clarify it for those who must work under it in the field) we are constrained to hold that a search is not 'incidental to an arrest' unless it is limited to the premises where the arrest is made; is contemporaneous therewith; has a definite object; and is reasonable in scope."

Although the *Cruz* case involved the search of an apartment which had no connection with the defendant, so far as

the police knew at the time of the arrest, and as to which he was in fact only a nonpresent guest, the opinion indicates an intention that the rule there announced should not be limited to those facts. Following *Cruz,* convictions have been reversed in *People* v. *Currier,* 232 Cal.App.2d 103 [42 Cal. Rptr. 562], *People* v. *Martinez,* 232 Cal.App.2d 796 [43 Cal.Rptr. 197], and *People* v. *Bustillos,* 237 Cal.App.2d 554 [47 Cal.Rptr. 283]. In each case a search of a dwelling place was held not to have been justified by an arrest which took place outside of it.

In *Martinez* and *Bustillos,* the police saw the defendant come out of a building and enter an automobile, where the arrest was made. In *Currier* the police saw the defendant come out of his hotel and proceed down the street. The point of arrest was 250 feet from the hotel.

On the other hand, in *People* v. *Davis,* 231 Cal.App.2d 180 [41 Cal.Rptr. 617], an arrest was made at the front door of a building which was apparently a rooming house. The search of room 7 on the second floor was held to be incident to the arrest.

In *Agnello* v. *United States,* 269 U.S. 20, 32 [46 S.Ct. 4, 70 L.Ed. 145, 149, 51 A.L.R. 409], the opinion states that "one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein." This statement is quoted in *Chapman* v. *United States,* 365 U.S. 610, 613 [81 S.Ct. 776, 5 L.Ed.2d 828, 831], and is referred to in the *Cruz* opinion. But in none of these cases did the court have occasion to decide whether "therein" must be taken to mean the interior of the four walls, or whether the premises may be said to include the doorway, porch and exterior walkways. In *Stoner* v. *California,* 376 U.S. 483, 486 [84 S.Ct. 889, 11 L.Ed.2d 856, 859], where the issue was consent, not proximity, the court used different language in stating the rule: "But a search can be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest. *Agnello* v. *United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409."

The most recent statement from our highest court is in *James* v. *Louisiana,* 382 U.S. 36 [86 S.Ct. 151, 15 L.Ed. 2d 30] decided October 18, 1965, where the arrest was held not to justify the search of a house two blocks away. The language used by the court in *James* was from the *Stoner*

case: The search must be "confined to the immediate vicinity of the arrest."

We have concluded that in the case at bench apartment 26 was a part of the premises where the arrest was made, within the meaning of the *Cruz* decision. The search was "confined to the immediate vicinity of the arrest," and was incidental to the arrest in all other respects. The arrest was made as the suspect stepped from the stairway onto a private walkway, a part of the premises which the tenants of apartment 26 were entitled to use. But the apartment had an even closer connection to the arrest than mere physical proximity. The arrest was upon suspicion of possession of heroin, and the apartment was the place where the arresting officer reasonably believed the arrestee was then committing this offense. Hernandez was in the act of departing from the scene of the crime, but had not yet left the premises.

If the law forbade a search of the interior of a building whenever the suspect was arrested beyond the threshhold, such a rule would not help innocent people "to be secure in their persons, houses, papers and effects." (U.S. Const., Amend. IV.) The practical result would be the opposite. To reverse this judgment upon the ground that the apartment should not have been searched is to instruct the police that they ought to break into a house whenever they have legal grounds to do so. Had the police rushed to the door of apartment 26 and broken it down while Hernandez was inside, the arrest would then have been made within the four walls and the search of the apartment would have been lawful under settled rules. (*Ker* v. *California*, 374 U.S. 23 [83 S.Ct. 1623, 10 L.Ed.2d 726]; *People* v. *Maddox*, 46 Cal.2d 301 [294 P.2d 6].)

We do not believe that under the circumstances of this case the scope of the permissible search is diminished by reason of the fact that the officers waited to arrest Hernandez as he walked out.

Each of the judgments is affirmed.

Jefferson, J., and Kingsley, J., concurred.

A petition for a rehearing was denied December 28, 1965, and appellants' petition for a hearing by the Supreme Court was denied February 8, 1966.