[Crim. No. 11030.   Second Dist., Div. Four.   May 27, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ROY LEE
PRESSLEY, Defendant and Appellant.

Erling J. Hovden, Public Defender, Hayes Mead and James
L. McCormick, Deputy Public Defenders, for Defendant and
Appellant.

Thomas C. Lynch, Attorney General, William E. James,
Assistant Attorney General, and Howard J. Bechefsky, Deputy
Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged with possession of marijuana in violation of section 11530 of the Health and Safety Code. A motion to dismiss under section 995 of the Penal Code was made and denied; a motion to suppress evidence allegedly illegally obtained was denied; trial by jury was duly waived and the case was submitted on the transcript of the preliminary examination, neither party offering any additional evidence. He was found guilty as charged, a motion for new trial was made and denied, probation was denied, and he was sentenced to state prison. He has appealed.

It is not contended that the evidence, if legally and properly admitted, was insufficient to support the conviction. The sole point here urged is that the evidence against defendant was the result of an illegal arrest and an illegal search. This contention was timely raised before the magistrate and, as above indicated, appropriately pursued throughout the trial court proceedings.

Some 10 or 15 times during a six-week period prior to January 4, 1965, Officer Brown of the narcotic squad of the Los Angeles Police Department was called on the telephone by a woman who identified herself as "Mrs. Roberts," and who claimed to be the grandmother of a person named Tommy Monahan. The subject matter of all of these calls was that the grandson was using marijuana and "pills" and that he was "running around" with two other persons named Bobby Ray and Roy Pressley. She described Pressley as being taller than Ray but shorter than Monahan. During one call, this woman, in response to a question from Officer Brown, said that she knew her grandson was using narcotics because she had found cigarettes in his possession which he had admitted to her were marijuana and that he had admitted using marijuana and pills. No written record was made of these calls, the officer made no attempt to contact the caller in person, he did not secure either a phone number or an address from her, and no other effort was made to investigate or corroborate the caller's story.

About 8:30 a.m., on January 4, 1965, the same woman again phoned Officer Brown. On this occasion she told him that the grandson was with Ray and Pressley at an address which she gave; she also gave "a description" of Ray's automobile "and other information."[1] The officer asked how the caller knew Pressley's address and she responded that, about a week

---

[1] The record does not disclose what description of the automobile was given, nor what the "other information" was.

before, she had gone to that address to get her grandson who had "passed out" and that, on the occasion of that visit, she had seen marijuana cigarettes on the table.

At about 2 p.m., on January 4th, Officer Brown, accompanied by Officer Shaw and Sergeant King, went to the vicinity of the address given, which was a second floor apartment. They observed Pressley and two other persons (later identified as Ray and Monahan) enter the apartment, using defendant's keys.[2] About 40 minutes later, Ray and Monahan left, entered a car later identified as Ray's and drove off.[3] The officers followed the car for about eight blocks, identified themselves, and pulled it over. During a "conversation," the officers noticed a small pipe on the front seat "with the odor of marijuana in it" and, on the floor, "a few seeds."[4]

After the officers "had the conversation with them [presumably Ray and Monahan] regarding the actions,"[5] the officers returned to Pressley's apartment, arriving at about 3:05 p.m. As they approached the door, Pressley walked out. The subsequent events were described by Officer Brown as follows: "He looked around over his right shoulder and I observed his head move in the direction of the Officer, Officer Shaw and myself, and he immediately started to run. She [sic] ran approximately five feet and then he jumped off the balcony.

"Before he jumped off the balcony I hollered, 'Police Officers don't do it you will hurt yourself,' and he continued his jump. At this time I ran to the back of the stairs to block the rear entrance as Mr. King was in the front and Mr. Shaw hung over the rail and dropped to the ground.

"At this time when I got to the bottom of the stairs the defendant was running Westbound and Mr. Shaw was immediately in back of him running at a high rate of speed. Mr.

[2]There is nothing in the record to show that the officers had any previous contact with, or information concerning, any of the three men involved, or that they knew any of them by sight.

[3]We are not told whether or not the car fitted the "description" given Officer Brown by the telephone caller.

[4]The pipe was not offered in evidence, and there is no testimony that the "seeds" were marijuana, nor that the officers thought that they were marijuana.

[5]Defendant contends that Ray and Monahan were illegally arrested and that evidence obtained thereby was, thus, improperly used to show probable cause. But the record shows only that they were stopped, that a "conversation" followed and that they were searched. No evidence as to the result of that search was offered, the evidence of the pipe showed only that it was seen and smelled when the car was stopped (not a search); and there is no evidence that Ray and Monahan were detained after the "conversation."

Shaw stopped him as he got to the sidewalk which was approximately one hundred feet.

"We then identified ourselves again and asked him why he ran. He said, 'I knew you were cop's [*sic*] and I was just running.'

"I asked him if he wanted to go back up to the apartment and he stated yes. I asked him if he had anything in the apartment he should not have and he stated no. I asked him if I could search it and he stated yes.

"He was in handcuffs at this time. Sergeant King had placed handcuffs on him and when we got to the top of the stairs he was attempting to get the apartment key from his pocket with handcuffs on and he was having a difficult time, so I asked him if I could get the key and he said yes. I removed the key, opened the door and we entered.

"We sat him down in front and Sergeant King gave him his rights regarding an attorney to be present, he could remain silent, anything he stated would be used against him." A search of the apartment followed, resulting in the discovery of a substantial quantity of marijuana. Pressley was then taken to a hospital for treatment of a broken ankle, sustained in the jump. After his treatment, under interrogation, Pressley admitted ownership of the marijuana.[6]

We conclude that the search of the apartment was lawful and the evidence thereby obtained lawfully admitted. Since the only objection to the use of defendant's hospital confession was that it was a fruit of the earlier arrest and search, that evidence was also admissible.

I

█ Although the telephone caller can scarcely be regarded as a "reliable" informant, her information, taken in its totality, certainly was enough to authorize the officers to go to the address given and to investigate activities there. On arriving at the apartment, the officers observed three persons who fitted the description previously given of the three men allegedly involved. Although that description was hardly enough to justify immediate arrest, the presence, at the

---

[6]The officer was not asked to amplify the testimony above set forth as to the nature of the warning on constitutional rights given defendant and there is no evidence that that warning was repeated at the time of the later interrogation at the hospital. However, the case was tried in March 1965, long after the final decision in *Dorado*, no objection to introduction of the confession was made on the *Dorado* ground and that point is not urged on appeal.

address given, of three men—no more, nor less—of the respective heights given the officers, again justified the action in pursuing two of them for questioning. That investigatory step disclosed evidence of recent marijuana usage. By this time, we think the officers had enough grounds to arrest the occupant of the apartment. While the caller stood somewhere between the usual "undercover" addict-informant and the citizen householder in *People* v. *Lewis* (1966) 240 Cal.App.2d 546 [49 Cal.Rptr. 579] her information had some reasonable corroboration. By this time the police knew that the three persons named were, in fact, connected with the address given and that one of them had a key to the apartment. At least one of them had recently used marijuana. We cannot say that it was unreasonable to believe that marijuana was, in fact, at that time, in the apartment, under the control of its occupant. It follows that the officers, as they approached the door, had grounds to arrest defendant. This being so, we need not decide whether his act of running away added anything to a probable cause already existent.

## II

We conclude, also, that the search of the apartment was "incident" to the arrest. Defendant relies on *People* v. *Cruz* (1964) 61 Cal.2d 861 [40 Cal.Rptr. 841, 395 P.2d 889], and other cases, which have held improper searches of a place distant from the point of arrest. But in *People* v. *Rodriguez* (1965) 238 Cal.App.2d 682 [48 Cal.Rptr. 117] we held that, where an arrest was made as the defendant was in the act of leaving a place where the officers reasonably believed narcotics were stored, the search was incident to that arrest. We there said at p. 690): "If the law forbade a search of the interior of a building whenever the suspect was arrested beyond the threshhold, such a rule would not help innocent people 'to be secure in their persons, houses, papers and effects.' (U.S. Const., Amend. IV.) The practical result would be the opposite. To reverse this judgment upon the ground that the apartment should not have been searched is to instruct the police that they ought to break into a house whenever they have legal grounds to do so. Had the police rushed to the door of apartment 26 and broken it down while Hernandez was inside, the arrest would then have been made within the four walls and the search of the apartment would have been lawful under settled rules. (*Ker* v. *California,* 374 U.S. 23 [83 S.Ct. 1623, 10 L.Ed.2d 726] ; *People* v. *Maddox,* 46 Cal.2d 301

[294 P.2d 6].) '' It is true that, in this case, the actual arrest was not made until defendant was under restraint and that his flight and struggle had carried him some 100 feet away. But we do not think that this is controlling. The process of arrest had begun at the door and, unlike *Cruz* and the cases following it, the defendant had not become disassociated from his apartment when the officers approached him and sought to make the arrest.

### III

Since we conclude that the search was lawful as incident to defendant's lawful arrest, we need not consider whether or not his acquiescence in the search amounted to a voluntary consent or whether it was tainted by the fact of arrest and his injury so as to make proper the invocation of *Castaneda* v. *Superior Court* (1963) 59 Cal.2d 439 [30 Cal.Rptr. 1, 380 P.2d 641].

The judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 20, 1966.