[Crim. No. 4025. Fourth Dist., Div. Two. Sept. 22, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ARTHUR PARKER, Defendant and Appellant.

## COUNSEL

Arthur E. Cooper, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Michael R. Botwin, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KAUFMAN, J.**—Defendant was charged by information with three counts of forgery (Pen. Code, § 470) and two prior felony convictions. After trial by jury, he was found guilty as charged, probation was denied and he was sentenced, on each count, to state prison for the term prescribed by law, the sentences to run concurrently. Defendant appeals from the judgment of conviction.

### Contentions

Defendant makes the following contentions: (1) the court erred in failing to exclude certain evidence seized by the police in an unlawful search of defendant's motel room; (2) the court prejudicially erred in striking evidence of defendant's repayment in connection with count III; and (3) the evidence is insufficient to support the conviction, because defendant's conduct did not constitute forgery.

### The Facts

#### A. *Defendant's Employment with the California Veterans Post.*

Walter Baxter was the owner and publisher of a Riverside newspaper named the "California Veterans Post." He solicited advertising through the use of salesmen who were paid on a commission basis. Salesmen were authorized to deduct the amount of their commission from any payment made by a customer in cash, but they were not authorized to endorse or nego-

tiate any check made payable to the newspaper by a customer. To facilitate telephone solicitation, it was not uncommon for salesmen to use names other than their true names. Sometimes salesmen worked in pairs.

Mr. Baxter had placed an advertisement seeking salesmen. Defendant answered the ad and was employed by Baxter on or about June 4, 1966. Defendant worked one day. He used the name "Bill Fry."

Several days later, defendant telephoned Mr. Baxter and informed him that he had sold an ad and that Baxter would be receiving the check therefor in the next few days. The check arrived, and Baxter paid defendant his commission. Thereafter, Baxter had no further communication with defendant, but in about September 1966, another person, Jack Teller, applied for a job as an advertising salesman and indicated that he would be working with a partner. Mr. Baxter issued to Teller for the alleged partner an extra identification card in the name of William F. Martin. Baxter never saw or heard from Teller again, but subsequently, as hereinafter set forth, defendant made use of this identification card.

B. *Count I: The Happy Wanderer Check.*

On the morning of February 9, 1967, defendant telephoned Mr. Ford, the co-owner of the Happy Wanderer Travel Agency in Barstow. He indicated to Mr. Ford that he represented the California Veterans Post and offered him six advertisements in the newspaper for $25. He received from Mr. Ford a check in that amount made payable to the California Veterans Post and gave Mr. Ford a receipt.

That same morning defendant went to the Top Hat Delicatessen in Barstow and asked Mr. Truel Delote, a part-time employee of the delicatessen, if he would cash the Happy Wanderer check. Mr. Delote knew the maker of the check. He asked defendant for identification, and defendant produced the identification card in the name of William F. Martin. In the presence of Delote, defendant endorsed the check by printing the name "California Veterans Post." When asked for further endorsement, defendant printed "W. F. Martin" on the check. Mr. Delote gave defendant $25 and endorsed the check with a rubber stamp.

After defendant left the delicatessen, as soon as Mr. Delote was free of customers, he telephoned the maker and inquired about the check. He then telephoned the police. Defendant had told Mr. Delote that he was staying at the Desert Inn Motel in Barstow, and Mr. Delote thereafter telephoned defendant and asked him to come in, repay the $25 and pick up the check. This defendant did. As will appear, this check was later found by the police in a search of defendant's motel room.

### C. *Count II: The Barstow Liquid Gas Check.*

On the same morning, February 9, 1967, defendant similarly obtained a $25 check from Mr. Leonard Myers, the owner of Barstow Liquid Gas Company, for advertising in the California Veterans Post. The check was made payable to the California Veterans Post.

At approximately 11 a.m., defendant went to Ted Hallett's Union Gas Station in Barstow and asked Mrs. Maxine Hallett if she would cash the check signed by Mr. Myers. She saw that it was a check from the Barstow Liquid Gas Company, a nearby business establishment, and asked for no identification. Defendant gave no identification. Mrs. Hallett agreed to cash the check, and defendant took the check outside to Mr. Enriquez, an employee of the gas station, who cashed the check. The check was endorsed "California Veterans Post," but neither Mrs. Hallett nor Mr. Enriquez saw defendant endorse the check.

Defendant then left the station and, about five minutes later, returned in an automobile with another person. Defendant then purchased $10.75 worth of gasoline and oil, for which he requested and received a receipt from Mr. Enriquez.

At approximately 3 p.m. on the same day, Mr. Myers came into the gas station. When he discovered that defendant had cashed the check, Mr. Myers gave Mrs. Hallett $25 and picked up the check. He then telephoned the police. Myers turned the check over to the police the next day, February 10, 1967.

### D. *Count III: The B & L Check.*

At approximately 3 p.m. on the same day, February 9, 1967, defendant obtained a check in the amount of $25 from the B & L Beverage Company in Barstow under the guise that it was a donation to the Veterans of Foreign Wars. The check was made payable to "V.F.W."

Defendant was staying at the Desert Inn Motel, and on the same afternoon, he asked Mr. Burnette, the manager, if he would cash the B & L check. Mr. Burnette agreed to do so, and defendant endorsed the check "V.F.W." Mr. Burnette asked defendant to sign his name to the check, and defendant wrote "W. F. Martin." Mr. Burnette gave defendant the cash and stamped the check with a rubber stamp. Defendant had no authorization from the Veterans of Foreign Wars to solicit funds nor to endorse its checks.

Later in the day, Mr. Burnette spoke to Mr. Delote at the Top Hat Delicatessen, where defendant had cashed the Happy Wanderer check. After this conversation, Mr. Burnette asked defendant to reimburse the money and

pick up the check. Mr. Burnette testified that defendant had subsequently repaid the $25. This testimony of repayment was stricken by the court on the ground that it was irrelevant and immaterial. Inasmuch as defendant was arrested shortly after 9:30 p.m. on February 9, prior to the promised repayment, and in view of the fact that the police obtained possession of the B & L check from Mr. Burnette on the night of the arrest, it is clear that this repayment occurred after defendant's arrest.

### E. *The Circumstances of Defendant's Arrest and the Search of His Room.*

On February 8, 1967, defendant had registered at the Desert Inn Motel. He placed two names on the register, one of which was W. F. Martin, and requested a room with twin beds. The motel manager never saw the other person.

On February 9, at approximately 9:30 p.m., the police arrived at the motel. In the lobby of the motel, in the presence of the motel manager and another officer, Detective James King talked with defendant about the B & L check made payable to the "V.F.W." He asked defendant if he represented the V.F.W. in Barstow. Defendant replied that he did. Detective King then asked defendant the name of the Commander of the V.F.W. in Barstow. Defendant replied that he did not know. Defendant also did not know any of the members of the V.F.W. in Barstow. Detective King then stated that he had some friends who were members of the V.F.W. and asked defendant what they might have to say about defendant's cashing a check made payable to the V.F.W. Defendant said "okay, you got me, you got me, you got the check, what else do you want, are you going to arrest me for forgery?" King replied, "No, not yet, I want to look into it a little further."

King then asked defendant whether he had cashed a check at the Top Hat Liquor Store. Defendant replied with a question, "Did they say that I did?" to which King replied, "Yes, they did." Defendant said, "Well, you have it, you ought to know." This, of course, was the check which defendant had picked up from Mr. Delote, and the officer did not have it. Detective King asked defendant where the check was, but defendant did not answer.

Defendant kept insisting that he be arrested for forgery, and became boisterous. Detective King placed him under arrest for investigation of forgery and advised him of his rights pursuant to *Miranda*. After being so advised, defendant stated that he understood his rights and was willing to talk. Defendant acted as if he had been drinking but also as if he understood the questions being asked him, and his answers were responsive although somewhat evasive.

Defendant was placed in a police car and taken to the Barstow Police

Department where he was further questioned by Detective King in King's office. About 15 minutes after defendant was arrested, King returned to the motel, contacted the manager and went with the manager and another police officer to defendant's room, which was on the ground floor of the building, the same as the lobby, and about 150 feet from the lobby. Detective King then searched the room. The record is silent as to how entry was effected. It appears only that the door to the room was shut prior to the entry. No contention is made, however, that the motel manager could validly assent to a search. (See *Stoner* v. *California,* 376 U.S. 483 [11 L.Ed.2d 856, 84 S.Ct. 889].)

The only items of evidence of significance found in the room were the Happy Wanderer check, the receipt for the purchase of gas and oil from Hallett's Union Station and numerous identification cards in different names, including the identification card from the California Veterans Post made out to William F. Martin.[1] These items were found on top of the dresser and on the bed. The check, the receipt and the identification card in the name William F. Martin were introduced into evidence at trial. The other identification cards were all returned to defendant at the request of his attorney at the preliminary hearing, but Detective King testified at trial to their existence.

After seizing the items found in the search of defendant's room, Detective King returned to the police station and further questioned defendant for about 10 minutes concerning these items. Defendant's answers were non-committal. When asked about the Happy Wanderer check, he responded, "You've got it." When questioned about the identification card, he replied, "You've got the card." When asked his true name, defendant replied, "Well, pick one. What does it matter, I use them all." Finally, defendant indicated that he wanted to go to sleep and did not want to talk about the matter further. Thereupon, Detective King ceased his questioning.

### F. *The Defense.*

The defense called only one witness. Mr. Levay testified that he was a bartender and that he had worked as a telephone solicitor in the past. The defense attempted to elicit from this witness that, as a matter of general practice, telephone solicitors who are out on the road frequently cash the checks given to them for their employer. Mr. Levay had never worked for the California Veterans Post, and the court sustained the prosecutor's objections to

---

[1] A number of other items were found, including a copy of the California Veterans Post, but in view of the uncontroverted firsthand testimony of all of the persons involved in the transactions, none of these additional items could conceivably have materially affected the verdict.

this testimony. The only other evidence offered by the defense was a sample identification card from the California Veterans Post.

### The Search of Defendant's Motel Room

The search was made on February 9, 1967, long before the decision in *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], and the legality of the search of defendant's motel room must be judged by pre-*Chimel* standards. (*People* v. *Edwards,* 71 Cal.2d 1096, 1107 [80 Cal.Rptr. 633, 458 P.2d 713].)

Defendant contends that the search cannot be upheld as incidental to his arrest because it was not contemporaneous with the arrest in time and place and that, furthermore, it was excessive in scope. (See *People* v. *Cruz,* 61 Cal.2d 861, 866 [40 Cal.Rptr. 841, 395 P.2d 889].)

As to the scope of the search, there is nothing to indicate that it was excessive. Detective King knew that the Happy Wanderer check had been returned to defendant and had, in fact, asked defendant where it was. There can be no question but what the search was directed at finding this check, and the only evidence seized was evidence of the commission of the crimes about which Detective King already had information. Although defendant signed two names to the register and asked for a room with twin beds, no one ever saw the supposed other person, and there is no evidence that he had any belongings in the room nor that, in fact, he existed or occupied the room. There is no suggestion that the room was not in the control of defendant. (*People* v. *Davis,* 231 Cal.App.2d 180, 184-185 [41 Cal.Rptr. 617].)

More troublesome is the question whether the search was contemporaneous in time and place with the arrest. The law applicable to cases like the one at bench prior to *Chimel* was a matter of considerable uncertainty. Many cases in various factual contexts have disapproved searches not made within the precise "premises" where the arrest occurred or "at a distance" therefrom (e.g., *Shipley* v. *California,* 395 U.S. 818, 819-820 [23 L.Ed.2d 732, 734-735, 89 S.Ct. 2053, 2054-2055] and cases there cited; *People* v. *Henry,* 65 Cal.2d 842, 845 [56 Cal.Rptr. 485, 423 P.2d 557]; *People* v. *Cruz, supra,* 61 Cal.2d 861, 865-866; *People* v. *King,* 60 Cal.2d 308, 311 [32 Cal.Rptr. 825, 384 P.2d 153]; *Castaneda* v. *Superior Court,* 59 Cal.2d 439, 442 [30 Cal.Rptr. 1, 380 P.2d 641]; *Tompkins* v. *Superior Court,* 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113]; *People* v. *Gorg,* 45 Cal.2d 776, 781 [291 P.2d 469]; *People* v. *Landry,* 276 Cal.App.2d 370, 375 [80 Cal.Rptr. 880]).  We are persuaded, however, by the reasoning and authorities cited therein that, under pre-*Chimel* standards (see *Skelton*

v. *Superior Court,* 1 Cal.3d 144, 156-157 [81 Cal.Rptr. 613, 460 P.2d 485]), the case at bench is governed by those cases treating a search of the defendant's room in a hotel or rooming house as a search within the "premises" notwithstanding that the arrest occurred in another part of the building. (*People* v. *Adame,* 250 Cal.App.2d 380, 384-385 [58 Cal.Rptr. 687]; *People* v. *Rodriguez,* 238 Cal.App.2d 682, 688-690 [48 Cal.Rptr. 117]; *People* v. *Aleria,* 193 Cal.App.2d 352, 355-360 [14 Cal.Rptr. 162] and cases there cited.) These cases carefully considered and discussed the uncertain law and upheld the validity of searches similar to that in the case at bench. In each case, a petition for hearing was denied by our Supreme Court, and in *Aleria* certiorari was denied by the United States Supreme Court (374 U.S. 832 [10 L.Ed.2d 1055, 83 S.Ct. 1876]).

■ The facts in the case at bench are fundamentally indistinguishable from those in *Aleria.* The only point of possible distinction is that in that case the defendant had not been removed to the police station at the time of the search. Rather, he was arrested and handcuffed by the police and escorted to his room. In view of the fact that, here, the search was made within 15 minutes after the arrest, we do not find this distinction meaningful. Although one of the bases of a search incidental to an arrest is the preservation and seizure of instrumentalities and fruits of the crime (*Preston* v. *United States,* 376 U.S. 364, 367 [11 L.Ed.2d 777, 780, 84 S.Ct. 881, 883]), there is no greater probability that such evidence will be destroyed when the defendant is in custody and manacled than when he has been arrested and taken to the police station. (Cf. *People* v. *Jackson,* 183 Cal.App.2d 562, 572 [6 Cal.Rptr. 884]; *People* v. *Stewart,* 144 Cal.App.2d 555, 559-560 [301 P.2d 301].)

As reasoned in *Aleria,* the question is whether there is "a substantial nexus between the arrest and the search such that they may be held a continuous transaction." (193 Cal.App.2d at p. 359.) The court there found the connection between arrest and search "plain for all to see." (193 Cal.App.2d at p. 360.) Likewise, in the case at bench, we think the connection between the arrest and search is plain to see. As in *People* v. *Rodriguez, supra,* 238 Cal.App.2d 682, 690, we conclude that in the case at bench defendant's room was a part of the premises where the arrest was made within the meaning of *People* v. *Cruz, supra,* 61 Cal.2d 861, 866 and that the search was limited to the premises where the arrest was made; was contemporaneous therewith, had a definite object; and was reasonable in scope. (*People* v. *Cruz, supra,* at pp. 865-866; *People* v. *Adame, supra,* 250 Cal.App.2d 380, 384-385; *People* v. *Rodriguez, supra,* at pp. 688-690; *People* v. *Aleria, supra,* 193 Cal.App.2d 352, 355-360.)

■ Even were we not persuaded of the validity of the search, the intro-

duction into evidence of the items seized would not require reversal, because it is clear beyond a reasonable doubt that this evidence did not materially contribute to the verdict obtained. (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The evidence of defendant's guilt was overwhelming and the evidence that resulted from the search was only cumulative and corroborative. (*Harrington* v. *California,* 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726].) Each of the persons involved in the several transactions testified at the trial and gave a firsthand account of what defendant did and said. In his statements to Detective King immediately prior to and after his arrest and in his repeated demands to be arrested for forgery, defendant all but admitted his guilt, especially as to the B & L check, and defendant presented virtually no defense.

Mr. Baxter fully testified about issuing the identification card in the name of William F. Martin and Mr. Delote testified that defendant used this card for identification when he cashed the Happy Wanderer check. Obviously, the introduction of the card itself was merely cumulative.

Mr. Ford testified fully concerning the making and issuance of the Happy Wanderer check, and Mr. Delote testified fully and in detail about defendant's presentation, endorsement and cashing of the check. From the reporter's transcript, it appears that Mr. Delote had testified independently to all of the material facts prior to the time he was shown the check itself, which was eventually shown to him for the purpose of refreshing his recollection as to whether defendant had endorsed the check "W. F. Martin" or "William F. Martin." It appears, therefore, that the introduction of the check itself was cumulative.

The only evidentiary value of the receipt for gas and oil from Hallett's Union Station was to corroborate the testimony of Mrs. Hallett and Mr. Enriquez that defendant had been in the station on February 9. Both of them testified in detail, however, that he was present and gave firsthand testimony of his words and conduct on that occasion. Their testimony was uncontroverted, and the corroboration supplied by the receipt was insignificant.

Defendant suggests that the seizure of the receipt may have led the police to the discovery of the Barstow Liquid Gas check and that, therefore, although that check was not found in the search of his room, it was tainted by the unlawful search. This suggestion is without merit. There is no evidence in the record that the police obtained the Barstow Liquid Gas check as a result of having discovered the receipt for defendant's purchase of gas and oil. Mr. Myers, the owner of Barstow Liquid Gas Company, had retrieved the check from Mrs. Hallett at about 3 p.m. on February 9 and telephoned the police. Defendant was not arrested until sometime after 9:30 p.m. that evening. The inference is, therefore, that the police knew about the Barstow

Liquid Gas check before defendant was arrested. The police obtained the check from Mr. Myers the following day, February 10. ■ When a defendant contends that an unlawful search has fatally tainted the police discovery of other evidence not actually found in the search, it is his burden to show some connection between the search and the evidence complained of. (Cf. *People* v. *Bradford,* 70 Cal.2d 333, 344-345 [74 Cal.Rptr. 726, 450 P.2d 46].)

### The Stricken Evidence of Repayment

■ As previously noted, the motel manager's testimony to the effect that, after his arrest, defendant repaid the amount of the B & L check to the motel was stricken by the court on the ground that evidence of such repayment was irrelevant and immaterial. In so doing the court did not err.

■ As a general proposition, subsequent restoration, restitution or repayment is not a defense to the crime of forgery. (*People* v. *Braver,* 229 Cal.App.2d 303, 306 [40 Cal.Rptr. 142, 10 A.L.R.3d 565]; *People* v. *Wynn,* 44 Cal.App.2d 723, 729 [112 P.2d 979].) It is recognized in *People* v. *Braver, supra,* upon which defendant relies, that, in some instances evidence of repayment may be relevant to disprove the defendant's intent to defraud, an essential element of the crime of forgery. In *Braver,* the defendant signed his aunt's and uncle's names on a promissory note and a chattel mortgage in obtaining a loan. The defendant then made payments on the note. The court, in reversing the conviction, found that the defendant's making payments on the loan constituted some evidence that he had no intent to defraud at the time the loan was sought and obtained.

■ In the case at bench, however, there was no loan transaction and no continuing obligation to repay such as exists in the case of a loan. The crime was complete when the check was cashed, and repayment by defendant after his arrest was not relevant to show his lack of intent to defraud when he endorsed and cashed the check.

We note also that the motel manager's testimony that on the afternoon or evening of February 9 prior to his arrest, defendant had agreed to repay the $25 the following morning was not stricken from evidence. We further note that the jury convicted defendant on count I involving the Happy Wanderer check notwithstanding the uncontroverted testimony that defendant had repaid the amount of that check and repossessed the check. Under these circumstances, there is no reasonable probability that the verdict with respect to the B & L check, count III, would have been more favorable to defendant had the evidence of repayment not been stricken. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

## Sufficiency of the Evidence

Defendant contends that a person who endorses a check as an agent is not guilty of forgery even if he did not have authority to do so. He relies upon *People* v. *Bendit,* 111 Cal. 274 [43 P. 901], and *Gilbert* v. *United States,* 370 U.S. 650 [8 L.Ed.2d 750, 82 S.Ct. 1399].

We note preliminarily that the Barstow Liquid Gas check (count II) was endorsed by defendant only in the name of the "California Veterans Post." The defendant endorsed the Happy Wanderer check by printing the name "California Veterans Post" and, upon request, printed the additional name "W. F. Martin." Defendant endorsed the B & L check (count III) "V.F.W." and, upon request, also wrote the name "W. F. Martin." Defendant did not indicate in words in any of the endorsements that he was the agent for the named payee, but it is apparently defendant's position that, inasmuch as the named payee in each instance was an artificial person which could endorse a check only through a representative or agent, his endorsement must necessarily be considered an agency endorsement. We need not determine the soundness of defendant's position in this regard, however, for we have determined that his basic contention is erroneous.

■ *People* v. *Bendit, supra,* 111 Cal. 274, does support defendant's contention. In that case the defendant, in the presence of the victim, signed his own name on behalf of a business firm without authority to do so. The court held that Penal Code, section 470, as it existed at the time of the defendant's conduct, had not changed the common law; that under the common law an agency endorsement without authority did not constitute forgery; and that, therefore, the defendant's conduct in that case did not constitute forgery. Said the court: "When the crime is charged to be the false making of a writing, there must be the making of a writing which falsely *purports to be the writing of another.* The falsity must be in the writing itself—in the manuscript. A false statement of fact in the body of the instrument, or a false assertion of authority to write another's name, or to sign his name as agent, by which a person is deceived and defrauded, is not forgery." (*People* v. *Bendit, supra,* at pp. 276-277.) *Gilbert* v. *United States, supra,* 370 U.S. 650 [8 L.Ed.2d 750, 82 S.Ct. 1399], applying the common law to interpret a federal statute, is to the same effect.

*Bendit* was decided in 1896, and the difficulty with defendant's contention is that it fails to take account of or give any effect to the amendment of Penal Code, section 470, in 1905. In that year the Legislature, in the face of the holding in *Bendit* that an unauthorized agency endorsement did not constitute forgery, added the following italicized words to the statute: "Every person who, with intent to defraud, signs the name of another person, . . .

*knowing that he has no authority so to do,* to . . . any . . . check . . . is guilty of forgery."[2] (Italics added.) The Legislature apparently thereby intended to countermand the holding in *Bendit.*

In the case at bench, defendant did the very thing proscribed by the 1905 amendment to Penal Code, section 470. He signed the name of another person (California Veterans Post and the V.F.W.) knowing that he had no authority so to do. Section 7 of the Penal Code defines the word "person" as including a corporation as well as a natural person, and section 8 of the Penal Code provides that when "an intent to defraud is required in order to constitute any offense, it is sufficient if an intent appears to defraud any person, association, or body politic or corporate, whatever."

The judgment is affirmed.

Gardner, P. J., and Tamura, J., concurred.

A petition for a rehearing was denied October 9, 1970, and appellant's petition for a hearing by the Supreme Court was denied November 18, 1970. Peters, J., was of the opinion that the petition should be granted.

---

[2]This amendment also broadened the crime of forgery to include signing the name of a fictitious person. (Stats. 1905, ch. 515, § 1, p. 673.)