Filed 12/30/20  P. v. Landino CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARIO LANDINO,<br><br>    Defendant and Appellant. | H044899<br>(Santa Clara County<br> Super. Ct. No. B1369147) |

A jury convicted defendant Mario Landino of tax fraud, forgery, and embezzling more than $200,000 from his business partner, Rosario Spatola,[1] at a pizzeria they owned together.  Landino handled the restaurant's finances and diverted both cash and checks, on some of which he forged the payees' endorsement, to his personal account.  Landino's defense was that Rosario received an equal share of the money, was aware of everything Landino did, and that it was all part of their joint scheme to avoid paying personal taxes on the restaurant's income.  The trial court suspended imposition of sentencing and placed Landino on three years' formal probation on condition that, among other things, he serve eight months in county jail.

On appeal, Landino raises the following arguments:  (1) his conviction for forgery must be reversed because there was no evidence that the checks in question defrauded the payees; (2) the trial court failed to sua sponte instruct the jury that accomplice testimony

---

[1] Rosario Spatola and his wife, Georgina Spatola, both testified at trial.  In the interest of clarity, we will refer to them by their first names, or collectively as "the Spatolas" where appropriate.

requires corroboration; (3) the trial court also failed to sua sponte issue a unanimity instruction directed at the various takings supporting the sentencing enhancements; and (4) the trial court erred by not making a Penal Code section 654[2] finding on his convictions for embezzlement and forgery.  As discussed below, we find no merit in any of Landino's arguments and will affirm the order of probation.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Statement of the case*

On August 25, 2016, the Santa Clara County District Attorney filed a second amended information charging Landino with three counts:  (1) embezzlement by a private employee of over $950 (§§ 487, 504; count 1); (2) forgery (§ 470, subd. (a); count 2); and (3) filing a fraudulent tax return (Rev. & Tax. Code, § 19706; count 3).  As to count 1, the information alleged an enhancement for taking property valued over $200,000 (former § 12022.6, subds. (a)(2), (b)), and as to all counts, the information alleged an aggravated white-collar crime enhancement for a pattern of fraud and embezzlement (§ 186.11, subd. (a)(1), (3)).

### B.    *The prosecution's case*

#### 1.    *Georgina Spatola*

When Georgina and Rosario got married in 1998, Rosario was working at Giovanni's Pizzeria and Landino was his business partner.  Rosario is "not terribly literate in English, and he doesn't have any bookkeeping knowledge."

On May 31, 2012, Rosario was concerned about the accounts at Giovanni's, so he showed Georgina some bank statements reflecting large transfers out of the business. The Spatolas went to the bank and obtained statements and checks for the prior seven years.  After speaking to an attorney about what they discovered, the Spatolas decided to terminate the partnership with Landino and lock him out of the premises.

---

[2] Unspecified statutory references are to the Penal Code.

2

After the locks were changed, Georgina inventoried, categorized, and copied all the business records at the restaurant, which took approximately two days. The business records were all analog, rather than digital, and the business ledgers included carbon copies of all the checks written since 2006. The checks were in chronological order, but Georgina noted that some pages were missing from the ledgers. Georgina spent approximately two months completing her audit of the business records.

In reviewing the records, Georgina noted that Landino had written a number of checks on the business account to pay for various personal expenses, including his homeowners insurance, satellite TV, cell phone, utilities, property taxes, income taxes, credit card bills, and his wife's dental insurance. Her audit also showed that Landino deposited into his personal account numerous corporate checks made out to Giovanni's, but he did not account for those checks in the business ledgers.[3] She also discovered that Landino had written Giovanni's checks to various parties—some of which were entirely fictitious—forged the payee's endorsement, then endorsed the check himself and deposited it into his personal account. Sometimes Landino put the name of a legitimate payee on the ledger, but then blocked the carbon so he could put his own name as the payee on the check itself. He also put fake invoice numbers on the checks, and sometimes used estimates for various business-related repairs or services as evidence of actual business expenses.

Georgina discovered numerous electronic transfers, of anywhere from $2,000 to $10,000, to Landino's bank account which were not recorded in the business ledgers. Landino wrote checks on an outstanding business credit line, but none of those payments were recorded on the restaurant's ledgers. Some of the checks were written to Landino,[4]

[3] Georgina testified about three specific checks written to Giovanni's by Broadcom, two for $4,000 and a third for $8,000. Landino endorsed all three checks but deposited them into his personal account rather than the business account.

[4] According to Georgina, Landino wrote four checks to himself for $1,000, $3,000, $3,000, and $15,000 against the credit line.

but one was written to Bay 101, a card club in San Jose, in the amount of $5,000. Landino wrote a check to the United States Treasury for more than $8,700, along with another check to the Franchise Tax Board.[5] Both of the latter checks included Landino's social security number which indicated to Georgina that they were written to pay his personal taxes, not business taxes. After the Spatolas locked Landino out of the business, they converted the $30,000 owed on the restaurant line of credit into a personal loan in order to avoid a balloon payment.

Finally, Georgina testified that her audit of the business ledgers revealed that Landino had been underreporting the restaurant's income as well as the partners' income, and thus had been underpaying federal and state income tax. Landino was withholding 15 percent from the wait staff's cash tips, but he did not account for that money or report it to the tax authorities.

Georgina and Rosario initially sought to resolve the financial problems with Landino through their respective attorneys, but once it became clear that they could not do so, they reported Landino to the Sunnyvale Police Department.

### 2. *Attorney William Priest*

Priest testified that Rosario contacted him in late June 2012 because he thought Landino was stealing from the partnership. Priest asked Georgina to bring a copy of the partnership agreement plus "whatever documentary evidence . . . she thought might be useful" to their first meeting on June 25, 2012. Following that meeting, Priest drafted and mailed a letter to Landino, informing him that he was being locked out of the business.

### 3. *Rosario Spatola*

Rosario testified that he met Landino about two years before they entered a partnership to run the restaurant and considered him a good friend. Rosario worked in

---

[5] Georgina was not asked the amount paid to the Franchise Tax Board on this check, and we could not locate any other reference to this check in the record on appeal.

the kitchen and dining room and trusted Landino to take care of the bookkeeping for the restaurant. Rosario did not understand accounting or bookkeeping.

In November 2011, Rosario noticed some suspicious transactions when he looked at recent bank statements for the restaurant. Specifically, he saw that a cash withdrawal had been made from the business account from a location in Pennsylvania. Rosario knew that Landino's son had moved to Pennsylvania and, around that same time, Landino had asked Rosario if he knew whether Bank of America had branches in that state.

Rosario did not want to accuse Landino unjustly, so he took the statements to Bank of America and spoke with an employee about what the entries meant. The employee instructed Rosario how to access the restaurant's statements online so that he could examine them for other unauthorized or suspicious transactions. After he did so, Rosario saw that $10,000 had been withdrawn from the account on March 7, 2011, at a casino in Palm Springs. After some further investigation, Rosario told Georgina about his suspicions on May 31, 2012.

Rosario never gave Landino permission to withdraw $10,000 from the restaurant account on March 7, 2011. He was not aware that Landino took checks made out to Giovanni's and deposited them into his personal account, and never gave Landino permission to do that. Rosario denied ever taking any of his partnership draw in cash. He did not know that Landino personally withdrew cash from the Giovanni's account; transferred money to his personal account; wrote checks for his personal expenses; wrote checks to himself, but put other names on the ledger; wrote checks to employees and other people and deposited them into his own account; and wrote checks to Giovanni's and deposited them into his own account. Rosario never authorized Landino to do any of those things.

Rosario believed he and Landino were being paid the same amount from the restaurant. He never gave Landino permission to withdraw money from the restaurant's credit line for his own use and, in fact, Rosario believed that credit line had been closed.

5

Landino did not give Rosario half of what he was taking from the restaurant in cash, and Rosario never agreed that Landino could deposit business checks into his personal account so they would not have to pay taxes on the income.

### 4.     *Stan Yee*, *property manager*

Yee testified that he was the landlord's property manager for the mall where Giovanni's restaurant was located and was responsible for collecting the rent and other payments from the tenants. The prosecutor showed him a check made out to the landlord from Giovanni's, but Yee said the amount written on that check did not correspond to the restaurant's rent or other expenses for which the tenants received bills. The endorsement on the rear of the check was hand-written, and Yee testified he always employed a rubber stamp to endorse tenants' checks.

Yee was shown a second check and he confirmed it was one he wrote to Giovanni's as payment for a corporate lunch meeting he held at the restaurant. However, Landino deposited that check into his personal account, not the restaurant account as Yee intended.

### 5.     *Tracy Barranco*, *card club cage manager*

Barranco testified she has worked at a local card club, Bay 101, for 21 years. At the time of trial, she was a cage manager and was responsible for overseeing the tellers at the club. Customers would go to the tellers to purchase casino chips using cash, checks, or credit. They would also go to the tellers to redeem casino chips for cash. On occasion, rather than using a personal check, customers who had obtained prior approval from Bay 101 could utilize a "countercheck" to purchase chips. The check would be written in a specified amount payable to Bay 101, up to a preapproved limit, and the customer would receive cash or chips in that amount. If the customer did not return within a specified time period to redeem that check in full, Bay 101 would submit it for payment from the customer's bank.

6

Barranco had seen Landino at the teller's cage "four or five times a month" over the years, but always by himself and she did not recognize Rosario when shown a photograph of him by the prosecutor. Landino often used counter checks to draw on his personal bank account and would sometimes redeem them before they were cashed. Barranco testified that, according to Bay 101's records, Landino was first approved to write checks to Bay 101 in 2001 but he closed that account in 2012. After reviewing Landino's 26-page transaction history, Barranco estimated that anywhere from $100,000 to $500,000 had passed through his account.

### 6. *Landino's preliminary hearing testimony*

Pursuant to a stipulation, portions of Landino's preliminary hearing testimony were read into the record. Landino testified that he met Rosario in 1993 and they bought the restaurant together in approximately 1998. Landino handled the bookkeeping because he previously owned a restaurant and knew "how to pay taxes, how to deposit taxes for payroll, for the employees, all the stuff." He admitted that he sometimes took corporate checks that had been made out to Giovanni's and deposited them in his personal bank account. However, Landino said that, every time he did so, he would give half to Rosario in cash or by personal check. He did this so he and Rosario could avoid paying taxes on the income. On occasion, Rosario would ask Landino to write him a personal check instead, so that if he were ever audited, he could show that he had enough income to pay his mortgage. The money they received from these corporate checks was in addition to their usual monthly draw which averaged $5,000 apiece.

Landino also testified he used business checks to pay personal expenses, because the restaurant was paying $2,500 per month for Rosario's family's health insurance and Landino was not getting a similar benefit. To equalize the payments, Rosario agreed that Landino could deposit $2,500 in corporate checks into his personal account. However, Landino did not deposit enough to equalize the payments. Rosario promised to make the shortfall good, but he locked Landino out before that occurred.

7

Sometimes, Rosario asked Landino to give Georgina cash, usually $2,000, from the business. Landino believed that Georgina knew Rosario was taking money from the business. On one occasion, Landino advised Rosario not to let Georgina " 'get involved with the pizza place' " because Rosario kept giving her " 'cash, cash, cash.' " Rosario replied that Landino did not need to worry about it because " 'My wife know [*sic*] nothing.' "

Landino admitted that he was "avoiding taxes," but that he and Rosario "did [tax evasion] both together." Landino reported the partnership draw as income to the tax authorities, but never reported any checks he deposited to his personal account. He also did not report any of the personal bills and property taxes that he paid with checks written on the business account. Despite knowing that his tax returns were false, he signed them under penalty of perjury.

Landino also admitted writing a business check for $2,285 payable to the landlord, but he never gave that check to Yee. Instead, he endorsed it with the landlord's name and his own, despite not having permission to do so, then deposited it to his personal account.

### 7. *Gary Kelmeson*, *tax preparer*

Kelmeson testified that he has been a registered tax preparer for 30 years. He first met Landino in 1986 when he began preparing Landino's personal tax returns. Kelmeson did not provide personal tax preparation services to Landino every year thereafter, but he did so for tax years 2009, 2010, and 2011. In January 2009, Landino hired Kelmeson to also prepare Giovanni's financial statements, taking the information Landino provided to prepare quarterly income statements and balance sheets, as well as payroll, sales and annual tax returns. Landino kept ledgers for the restaurant that were referred to as "green sheets" or a "one-write system." When Landino wrote a check in the restaurant's ledger, the carbon paper underneath the checks copied the information onto the ledger.

A few days after the end of each quarter, Kelmeson would go to Giovanni's, pick up the green sheets from Landino and write down the monthly deposits reflected on the

8

restaurant's bank statements.[6]  Kelmeson prepared the forms and financial statements at his home.  Within a week, Kelmeson would return to Giovanni's and give the green sheets, tax forms, and financial statements to Landino.  Kelmeson worked exclusively with Landino throughout this process.  Although he would occasionally see Rosario at the restaurant and knew he was Landino's business partner, his interaction with him was limited to exchanging greetings.  They did not engage in any substantive conversations and Rosario never asked him about the restaurant's finances.

Landino also asked Kelmeson to prepare the restaurant's tax returns for tax years 2009, 2010, and 2011.  In preparing those returns, Kelmeson relied on the green sheets and deposit information provided to him by Landino, but Landino was the one who attested to the accuracy of the restaurant's tax returns by signing them.  Kelmeson testified he was not aware of any possible wrongdoing when he prepared the restaurant's financial statements and tax returns.

However, in April 2009, Landino told Kelmeson that " 'the tips and payroll were combined on the [employee] payroll checks.' "  Kelmeson advised him that was improper and "immediately provided" Landino with "proper IRS forms for the employees to fill out to allow for proper documentation of tips by employees" so that the payroll checks would segregate earnings and tips.  Landino replied that because the net amount for tax purposes was the same, there was no need to segregate them.  Kelmeson did not pursue the matter further and never mentioned the issue to Rosario.

When preparing the financial statements for 2011, Kelmeson noticed that the restaurant's bank account reflected a balance of $19,537.65 on December 31 of that year, but by his calculations, the balance should have been $64,537.65.  Kelmeson believed the discrepancy was due to the credit card "merchant fees . . . not being reported on the green [sheets] adequately."  He added an entry of $45,000, which he labelled "credit card

---

[6] In recording the monthly deposits, Kelmeson never looked through the statements, but only wrote down the total amount of deposits shown on the first page.

discount-banking" in order to reconcile the two figures. Kelmeson acknowledged the discrepancy could also have been caused by someone diverting $45,000 from the restaurant's accounts but he had no reason to suspect such a thing had happened. Regardless, Kelmeson never asked Landino or Rosario about the discrepancy, nor did he inform them that he created the $45,000 entry which balanced the account.

Kelmeson met with Landino for the last time in August 2012, after Landino had been locked out of the partnership. At that meeting, Landino admitted to Kelmeson that he "sometimes" would write checks on the green sheets to himself, but make it appear the checks were written to vendors. Landino said he deposited the checks into his personal account, then wrote personal checks to the employees to pay their tips.[7] Landino gave Kelmeson documentation for part of the time in question so that Kelmeson could confirm that the amounts diverted to Landino's personal account equaled the amounts he disbursed to employees. Although the sums matched perfectly for the period that Landino provided documents, Kelmeson testified "there [was] no documentation" "[f]or a significant period of time." Kelmeson's calculations were also based solely on the checks Landino provided.

At that same meeting, Landino disclosed to Kelmeson for the first time that the restaurant had a line of credit. Landino never explained to Kelmeson why he was making withdrawals from this credit line, but he did indicate to Kelmeson that he needed to repay the partnership for them.

In addition, although Landino informed Kelmeson that he and Rosario split the cash receipts, Kelmeson never saw any cash in the office. Landino also never showed Kelmeson deposit slips demonstrating that he or Rosario regularly deposited cash in the restaurant's bank account.

---

[7] These checks were described in detail in defense exhibit F and formed the basis for Kelmeson's testimony that the amounts diverted to Landino matched almost exactly the amounts Landino claimed that he paid to employees as tips.

Between February and April 2013, Kelmeson exchanged e-mails with Georgina regarding the accounting irregularities she had discovered. Georgina asked for Kelmeson's records for the restaurant, and in one of his responses to her, Kelmeson wrote " 'many times I ha[d] to do the best I could with only partial information.' " Following his August 2012 meeting with Landino, Kelmeson was aware he had not been provided all the relevant information related to the restaurant's finances.

### 8. *Benito Pelayo*, *HVAC repair*

Benito[8] testified that he worked in construction and did some HVAC repair work at Giovanni's. Landino always paid him in cash for the work that he did, never with a check. Benito was shown a check that was made out to him from Giovanni's, but Benito denied ever receiving such a check and the signature purportedly endorsing it was not his. Benito did not authorize anyone to deposit a check in his name into someone else's bank account.

### 9. *Adrian Pelayo*, *cook*

Adrian worked as a cook at Giovanni's for 19 years. He would always arrive for work at 8:00 or 8:30 a.m. to prep for the day, before either Landino or Rosario arrived. Landino would arrive next, and Rosario would be in around 10:00 a.m. When Rosario arrived, he would go into the office. If Adrian was in the office in the morning when Rosario arrived, he would see Landino hand some cash to Rosario. However, Adrian said that Rosario would go to the cash register afterwards, "if he need [*sic*] some change, count the money . . . to start the day." Adrian never saw Rosario carrying a bank bag.

Adrian was paid by check for his work at Giovanni's, though he sometimes asked Landino if he could get his wages in cash instead. Landino would then give Adrian cash and keep the paycheck. Adrian could not remember if Landino ever asked him to endorse the paychecks when he was paid in cash instead. Of the three checks Adrian was

---

[8] Because his brother, Adrian Pelayo, also testified, we will henceforth refer to the brothers by their first names.

shown during his testimony, one of them "was close" to the right amount of his wages, one of them was the "right amount," but the last one was not the right amount. Although the checks were endorsed with his name, it was not his signature on any of them.

10. *Vincent Vespertino*, *waiter*

Vespertino testified he worked as a waiter at Giovanni's for more than 20 years. Landino was his uncle. Over the years, his work schedule never really changed, and, on Mondays, he would arrive at the restaurant for his first shift around 10:30 a.m. Before starting work, Vespertino would go into the office to drop off his bag and put on his apron, then go prepare for the lunch rush. Landino was consistently at work before he arrived, but Rosario would usually arrive later.

Vespertino testified the door to the office was never fully closed, unless someone was "in trouble," and everyone knew not to "go in when the door was shut." Although Vespertino sometimes saw Landino and Rosario go into the office and close the door, that did not happen often, and he never saw that happen on Monday mornings. According to Vespertino, when Landino was in the office, he was counting the cash, writing checks, placing orders, and talking to Rosario if he was there. Vespertino never saw Rosario counting any of the cash at the restaurant, nor did he see anyone exchanging cash on Monday mornings. Landino was the only person who brought cash back from the bank for the register, and Vespertino would see Landino leave the restaurant with a "Bank of America bag." Vespertino never saw Rosario walk out of the restaurant with any such bag.

According to Vespertino, Georgina would occasionally visit the restaurant, but her visits were generally brief. While she would say hello to Landino, Vespertino never saw Landino hand cash to Georgina. Georgina would not go into the office if Rosario was not there.

12

### 11. *Edward J. Sutton*, *tax preparer*

Sutton testified that he operated a financial advice and income tax preparation business and he had been providing financial services to the Spatolas for over 20 years. Prior to 2012, Sutton prepared their personal income tax returns and provided financial services related to Georgina's businesses. In the middle of 2012, Sutton was asked to handle the bookkeeping and taxes for Giovanni's. Sutton reviewed the records provided to him by Kelmeson and identified certain "accounting irregularities." Among the problems he discovered were that "the banks [*sic*] were not reconciled," there was a "extremely high amount" of nine percent charged for merchant credit card fees, the cost of goods was suspiciously consistent from year to year, and tips were not included with the payroll tax reports.

### 12. *Taver Chong*, *forensic accountant*

Chong, a forensic accountant with the district attorney's office, testified as an expert witness in forensic accounting, financial auditing, generally accepted accounting procedures, and federal and California state income tax submissions. Chong reviewed financial records, including tax returns, from the restaurant, Landino, and the Spatolas. He also examined the restaurant's ledgers, the partnership agreement between Landino and Rosario, as well as casino records.

Chong prepared several documents which were admitted into evidence. Exhibit 28 was a document entitled "Giovanni's Pizzeria checks diverted to . . . Landino's personal Bank of America account." The document consisted of a list of 242 checks from a variety of companies which were deposited into Landino's personal bank account even though Giovanni's was listed as the payee. In all, $169,150.20 in funds were diverted to Landino's personal account beginning in May 2007 and ending in June 2012.

Exhibit 31 was a one-page document entitled "Checks written to [*sic*] Giovanni's Pizzeria to others but cashed by [Landino]." Each of these checks, some of which were written to companies and others to Giovanni's employees, were deposited into Landino's

13

personal account. According to the exhibit, the checks to individuals totaled a little over $14,000 and those written to companies totaled a little over $31,000.

Exhibit 32 was a two-page document reflecting "Checks from Giovanni's Pizzeria that went to utilities or other potential personal expenses of [Landino]'s." Chong identified a total of $22,000 in payments from Giovanni's which were used to cover Landino's personal expenses, such as phone bills, utilities, and personal tax obligations.

Exhibit 33 was a one-page document entitled "Payments from Giovanni's Pizzeria to Mario Landino and Rosario Spatola." Chong described the document as a "listing and comparison of moneys paid out to Rosario Spatola and moneys paid out to Mario Landino" from the Giovanni's account. One check was recorded in the ledger as an expense paid to "the 'Montague Company,' " but the actual check was payable to Landino and was deposited into his personal account. The document also tracked direct transfers from Giovanni's account to Landino's personal account as well as receipts for cash withdrawals from the business account made by Landino. For 2011 alone, Landino withdrew or transferred a total of $45,300 from the business account.

Exhibit 34 was called, "Mario Landino's personal checks to Giovanni's Pizzeria's employees" which were purportedly written to reimburse the employees for their tips. Chong discovered three checks to employees listed in exhibit 34 that were not included in the defense exhibit F, which sought to match up funds Landino diverted to his personal account with the tip reimbursement checks he wrote to employees against his personal account. The total amount of the checks Landino wrote to employees was $38,626 for the period beginning February 2010 and ending March 2011. Over that corresponding time period, the checks Landino wrote to other businesses, but deposited to his account, and the checks he wrote to himself, but recorded that they were written to other businesses, totaled only $33,952.43. This was a difference of around $5,000; not the 36-cent difference described by Kelmeson.

14

In exhibit 35, called "Tax calculations for Mario Landino," Chong compared what Landino actually reported to the federal and state tax authorities in 2010 with what his tax liability would have been had he properly reported the business funds which he diverted into his account. According to Chong's calculations, Landino should have paid an additional $3,416.24 in federal taxes and $460.41 in state taxes that year.

Exhibit 41 was a one-page document comparing, by year, all the deposits made by Landino to his personal account with all the deposits made by the Spatolas to their personal account. For 2007, Landino's cash deposits and diverted checks were nearly six times greater than the Spatolas' cash deposits that year. In 2011, Landino's deposits were four times greater than the Spatolas'. Chong admitted that some of Landino's deposits could have been gambling winnings and, in general, it was difficult to determine where cash comes from.

Exhibits 42 and 43 documented Landino's transactions on his personal account, including checks[9] and non-check withdrawals, at various casinos in San Jose, San Diego, Palm Springs, Las Vegas, and Pennsylvania. Between May 2007 and June 2012, Landino wrote checks totaling $751,200 in these various casinos. From April 2009 through July 1, 2013, he also made 256 non-check withdrawals at casinos, totaling $374,121.85.

C.    *The defense case*

1.    *Genoveva Gonzalez, waitress*

Gonzalez worked at Giovanni's as a waitress and cashier for approximately 18 years. On Mondays, she usually arrived at 10:15 a.m. and Adrian, Landino, and Rosario would already be there. The employees were paid on Monday, so Gonzalez would go to the office on that day to collect her biweekly wages. There was usually cash on the desk

---

[9] Chong testified the check transactions included counter checks issued by Bay 101 casino and subsequently cashed on Landino's account.

in the office, but she never saw Landino give cash to Rosario. Sometimes, however, Landino and Rosario were in the office together with the door closed.

On March 21, 2016, Gonzalez spoke to defense counsel, a private investigator, Landino, and Landino's son. At that meeting, she said that every Monday or every other Monday she saw Landino give Rosario his share in cash. This was on a Monday because that is when all the employees were paid, and she was paid in cash. Gonzalez said that Rosario would then go to the bank. There were separate piles of cash on the desk from the restaurant's income the week prior.

Gonzalez said that when she left court after her first day of testifying, she saw Paula Renshaw[10] outside of the courtroom, but she did not speak to her. Gonzalez denied telling Renshaw she did not care about losing her job and affirmed she was not fearful of losing her job due to testifying in this case. Gonzalez also denied telling Renshaw that Rosario "knew everything about the business." She did not tell Renshaw that Rosario called her a bitch because she gave a statement to defense counsel or when she told him Landino had subpoenaed her to testify.

When Gonzalez first began working at Giovanni's, she would be paid her cash tips every day, but the wait staff would get a weekly check for the credit card tips. On occasion, she would get a personal check from Landino for her tips, rather than a business check. When Landino was on vacation, Rosario would hand out the payroll and tip checks.

On cross-examination, Gonzalez testified that Landino came to her house one time after he was locked out of the restaurant and told her that Rosario was accusing him of stealing money. She replied " '[t]hat was not fair.' " Gonzalez also told Landino she had seen him taking cash from the tip bucket at the restaurant, and Landino did not deny it.

_____

[10] Paula Renshaw is Landino's daughter and previously also worked at Giovanni's.

16

Instead he asked Gonzalez if Rosario knew. Landino asked if she would talk to his attorney, but Gonzalez said she did not want to.

Landino subsequently showed up at her house with his defense counsel, a private investigator, and Landino's son. Landino's son, Giuseppe, had recently been ordained as a priest and was dressed as such. Gonzalez did not know who the other two men were until after she let them all inside. Landino asked her if she saw cash on the desk in the restaurant's office because that would be "proof," and he told her that both Giuseppe and Renshaw had seen cash on the desk. Landino also told her he gave some of the cash to Rosario, and he took it to the bank. Again, Landino said that both Giuseppe and Renshaw knew that those things happened.

Gonzalez replied that she remembered seeing cash on the desk, but not Landino giving cash to Rosario. However, Giuseppe was telling her that Rosario did take cash from Landino and she did not want to disagree with him. Landino said that he had been in jail. Gonzalez did not want to be responsible for sending him back, so she agreed with what he and Giuseppe told her. Once she did so, the investigator turned on the recorder and recorded her interview.

On redirect, Gonzalez said that she was not pressured by Rosario about her testimony. She does not favor Landino to Rosario or vice versa. However, after Landino was locked out of the restaurant, she saw him at the bank. He was crying and he asked her to help him by talking to his attorney. Gonzalez was uncertain about talking to Landino's attorney, so she never contacted him.

### 2. *Paula Renshaw*, *waitress*

Renshaw, Landino's daughter, worked at Giovanni's off and on from 1993 to 2009. On three or four occasions, she was in the office and saw Landino hand Rosario one of two stacks of cash, saying " 'Here compa, here's your money.' " Renshaw did not know how much cash was involved, did not know where Landino got the money, and did not know what Rosario did with it afterwards.

17

After Renshaw began working at the restaurant part-time in 2001, she once saw Rosario pull money from the safe in the office. Rosario told her he was taking the money to the bank, saying " 'This is the money that me and your dad split so I can pay my credit cards off because they're extremely high.' "

Renshaw testified she was waiting outside the courtroom a few days prior, when she saw Gonzalez, who had just testified, walk out. Gonzalez appeared to be upset and told Renshaw that Rosario called her a "bitch" when she told him she had been subpoenaed to testify by Landino. Gonzalez also volunteered to Renshaw that she "didn't care about losing her job," and that "Rosario knows everything," including "everything about how money was split."

On cross-examination, Renshaw said that Landino used to cash payroll checks for herself and for other restaurant employees, and Rosario saw this occurring. When she worked at the restaurant up to 2009, tips were split among the servers in cash. After 2009, when she came back occasionally to help, the procedure had changed, but she never got a check for the tips because she was not working as a server at the time. As far as Renshaw knew, the only people with access to the safe were Landino, Rosario, and her brother.

### 3. *Landino*

Landino testified he and Rosario bought Giovanni's on January 1, 1995 and operated the business as a partnership. Landino helped in the kitchen, but he also handled inventory and the finances, including payroll and taxes. Rosario made pizza and ran the kitchen.

Every night after the restaurant closed, either he or Rosario would put the cash from the business into the safe. Each Monday, Landino would go over the books and call the bank to check on credit card payments. After that, he divided the cash into two equal piles, one for himself and the other for Rosario, because they agreed to split the restaurant's cash equally. Landino would hand Rosario his share and Rosario would put

18

it either in the safe or in his pocket. Rosario was aware of and agreed with Landino's practice of never depositing any cash from the restaurant into its business account.

Giovanni's accepted cash, credit cards, and corporate checks as payment, but it did not take personal checks. Landino testified he would deposit corporate checks into his personal account and give half of the proceeds to Rosario in cash, while keeping the other half for himself. Rosario knew about this arrangement and approved of it. Landino and Rosario operated the restaurant's finances this way from 1995 to 2012. Landino said that Rosario told him Georgina did not know how they were handling the restaurant's cash and corporate checks.

Landino testified about checks written on the restaurant's account to vendors, to himself, or to "cash," all of which he deposited into his personal account over a period from February 2010 to March 2011. Landino said these checks were written to cover "employee costs," such as tips, that he was paying the waiters from his personal account. Again, Rosario knew Landino was doing this. The checks that Landino wrote to Giovanni's employees from his personal account and the checks written on the restaurant's account deposited into his personal account each totaled about $38,000. Landino paid the tips to the employees from his personal account in order to reduce the restaurant's reported income for tax purposes. This arrangement benefited both him and Rosario, and Rosario agreed with this practice.

When Landino would go on vacation, he would write payroll checks in advance and leave them for Rosario to hand out on payday. He also left personal checks for the tips, with the waiter's names filled out, and Rosario would fill in the amount for each week. On being shown some checks to Giovanni's employees written on his personal account, Landino testified that it was Rosario's handwriting in the fields designating the amounts.

Landino testified about some personal checks, introduced as exhibit M, written directly to Rosario. Rosario would sometimes ask Landino to not pay him in cash, but

19

with a check instead. According to Landino, Rosario wanted to make sure that, if he were audited, his income would appear high enough to pay his mortgage. Landino testified he was aware that Rosario had some financial difficulties because Rosario would tell him. Rosario would say " 'I have a problem, a lot of loan. My wife spends a lot of money unnecessary.' " (*Sic*.)

When Landino received the letter from Rosario's attorney on July 2, 2012, advising that he had been locked out of the restaurant, he was surprised. Landino said that Rosario lied when he said he did not know about splitting the cash from the restaurant or Landino depositing corporate checks into his personal account. Landino denied ever stealing money from the restaurant or embezzling money from Rosario. He filed a civil lawsuit against Rosario contesting his ejection from the partnership, which was still pending at the time of his criminal trial. Landino believed the restaurant was worth somewhere between $450,000 and $500,000, and he refused to walk away from his business. It was approximately a year-and-a-half after the Spatolas locked him out that they reported him to the police.

Landino admitted he used to gamble at local casinos, and that sometimes Rosario would go with him. When they went together, Landino and Rosario would gamble from the same pool of money. Landino mostly played poker and he had a line of credit at Bay 101. The casino would issue a check on his bank account and, within a certain time limit, he could buy back the check. He always gambled with his own money, not the restaurant's. However, on one occasion, he and Rosario paid for chips with a check written against Giovanni's credit line. Although they won, they were too late to redeem the check, so they simply split their winnings.

Landino testified about the credit line he and Rosario opened to buy a van for the business. On one occasion, they used the account to pay a broker $6,000 for stock they had purchased on margin. Landino also used the account to purchase a car for his son. However, Landino paid money back to the credit line from his personal account.

20

Rosario lied when he said he thought the credit line was closed because in late 2011 or 2012, Rosario wanted to use it to pay $15,000 towards an SUV he purchased. Landino told him he was already using the credit line and there was not enough available, so Rosario ended up taking the money he needed from the safe at the restaurant.

On cross-examination, Landino admitted he signed Giovanni's California tax returns for 2009, 2010, and 2011 under penalty of perjury despite knowing they were incomplete when he signed them. The tax returns did not include the income from corporate checks, but Landino simply signed what Kelmeson prepared. Landino said that Rosario also signed the returns, but when shown copies of the returns, he could not point to where Rosario signed. He and Rosario split the cash from the restaurant because it was how they did things, not because they were avoiding taxes. Landino testified that it was not fair that he was the only one being blamed for tax fraud, since he and Rosario always split the money all those years.

When asked about depositing corporate checks into his personal account to cover tips, Landino said he did not understand bookkeeping and was not an accountant. He was not certain how Kelmeson used the information he provided to prepare Giovanni's tax returns and claimed, "I don't know that [the information]'s incomplete." Landino then conceded it was incomplete because the corporate checks were not reported as part of the restaurant's income.

Landino got a letter from the Internal Revenue Service in August 2012 indicating there was a problem with his 2010 personal income taxes. He brought the letter to Kelmeson and told him that he and Rosario had split the cash from the restaurant. He denied telling Kelmeson that he committed tax fraud. Kelmeson took the blame, saying the letter was because of a miscalculation on his part in preparing the return. However, at the preliminary hearing, Landino admitted he and Rosario committed tax fraud by not reporting their cash income from the restaurant.

21

Landino admitted he did not have permission from "Thu Refrigeration" to endorse the check he wrote to that business on the restaurant's account. The check was written and deposited into his personal account before he started paying the waiters their tips using his personal account. Landino said "the guy" from the company must have asked Landino to cash it for him, but he was not sure. Landino also admitted he did not have permission from another company called Horbat to endorse a check he made out to them. That check made out to Horbat was the first check he wrote to reimburse himself for the personal checks he was using to pay the waiters their tips. Landino was also shown five checks he wrote to Pelayo from the business account, and he testified Pelayo asked him to cash those checks for him. He gave Pelayo money from the safe and deposited the checks into his personal account. Landino said Pelayo was mistaken when he testified it was not his signature on the back of those checks.

Landino did the books for the restaurant because he had more experience in such matters and the partnership would save money on accounting. The partnership agreement prohibited withdrawals for personal use in excess of net profits. In addition, Landino admitted that the partnership agreement provided that the restaurant's " 'accounts shall be accurately kept and shall include records of all partnership income, expenses, assets and liabilities.' " Landino denied making any mistakes in his bookkeeping for the restaurant. It was Kelmeson's job to determine which expenses in the ledger were personal and which were for the restaurant.

When shown an example of a business check written to a third party but deposited into his personal account, Landino acknowledged that he labeled that check as a business expense in the ledger, rather than a personal draw. He admitted that this was not "accurate bookkeeping" but that was how he reimbursed himself for paying the waiters' tips and it was the procedure that he and Rosario agreed to. This "agreement" with Rosario was not in writing. Landino testified they did this to reduce the restaurant's reported income and thereby reduce their personal income tax liability. He admitted

signing the restaurant's tax returns knowing they were false and knew he was committing tax fraud by doing so.

Landino also admitted that he did not withhold payroll taxes on the tip payments he made to the waiters and he understood it was their responsibility to pay 15 percent as payroll tax. After he stopped writing the tip checks in January 2011, he, Rosario, and three other employees had a meeting to discuss how to account for the sales tax owed on tips paid by credit card. They reached an agreement in which Landino withheld 15 percent from the tips in order to cover the 8.75 percent sales tax. After paying the sale tax, he and Rosario split what remained.

Landino testified that there were two other ledger books at the restaurant which documented how much money he and Rosario took from the business for themselves. However, both books disappeared after the Spatolas locked him out of the business.

### D. *Verdict and sentencing*

After deliberations, the jury found Landino guilty of all counts and found both sentencing enhancements true.

At sentencing, the trial court suspended imposition of sentence, placed Landino on three years' probation, and directed him to serve eight months in county jail. The trial court ordered Landino to pay a fine of $2,000 (§ 186.11), a restitution fund fine of $280 plus a 10 percent administrative fee for a total of $308 (§ 1202.4), and imposed and suspended a probation revocation fund fine of $308 (§ 1202.44). In addition, the trial court imposed the following fees and assessments: a $120 court security fee (§ 2900.5), a $90 criminal conviction assessment (Gov. Code, § 70373), a $129.75 criminal justice administration fee payable to the City of Sunnyvale (Gov. Code, §§ 29550, 29550.1, 29550.2), a $150 presentence investigation fee (§ 1203.1b), and a probation supervision fee of $50 per month (§ 1203.1b).

Landino timely appealed.

23

## II.   DISCUSSION

### A.   *Sufficiency of the evidence to support forgery conviction*

Landino argues that his forgery conviction must be overturned because the prosecution failed to present any evidence that his conduct of writing business checks to third parties, endorsing those checks himself, and then depositing them to his personal account resulted in any harm to those third parties.  Landino relies on *People v. Cole* (1900) 130 Cal. 13 (*Cole*) and *People v. Bendit* (1896) 111 Cal. 274 (*Bendit*) for the proposition that forgery on a check requires an injury done to the payee not the payor.  We disagree.

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Section 470, subdivision (a), provides, "Every person who, with the intent to defraud, knowing that he or she has no authority to do so, signs the name of another person or of a fictitious person to any of the items listed in subdivision (d) is guilty of forgery."  Subdivision (d) includes "any check."  (§ 470, subd. (d).)

The two cases on which Landino relies, *Bendit* and *Cole*, are easily distinguishable and do not control.  In *Bendit*, the defendant sent a document purporting to show a balance due on a business account so that the debtor would be prepared to make payment when the defendant, who had no authority to act for the creditor company, came to collect.  (*Bendit*, *supra*, 111 Cal. at p. 276.)  The defendant collected the money owed and, in the presence of the debtor's cashier, signed the creditor's name, "Wm. Cluff &

24

Co.," to a receipt followed by his own initials, "A.B." (*Ibid*.) The California Supreme Court concluded that the defendant's conduct did not constitute forgery within the meaning of section 470, explaining: "When the crime is charged to be the false making of a writing, there must be the making of a writing which falsely *purports to be the writing of another*. The falsity must be in the writing itself—in the manuscript. A false statement of fact in the body of the instrument, or a false assertion of authority to write another's name, or to sign his name as agent, by which a person is deceived and defrauded, is not forgery. There must be a design to pass as the genuine writing of another person that which is not the writing of such person. The instrument must fraudulently purport to be what it is not." (*Bendit*, *supra*, at pp. 276-277.) The Supreme Court noted that because "there was no pretense that 'Wm. Cluff & Co.' was the genuine signature of that firm," the defendant could not have committed forgery. (*Id.* at p. 277.) The defendant signed his own initials to the receipt, not someone else's, and signing another's name as his agent is not forgery. (*Ibid*.)[11]

In *Cole*, the defendant was charged with issuing a counterfeit check, but "the information, while it states that the check was forged and counterfeited, shows upon its face that it was not." (*Cole*, *supra*, 130 Cal. at p. 14.) While there was some claim that an endorsement on the check by one " 'S. B. Smith' " was forged, the California Supreme Court pointed out that the *information* made no such allegation. (*Id*. at p. 15.) Because the supposedly counterfeit check was genuine on its face, the defendant's demurrer to the information should have been sustained. (*Id.* at p. 14.)

---

[11] As noted in *People v. Parker* (1970) 11 Cal.App.3d 500, section 470 was amended in 1905 to "add[] the following italicized words to the statute: 'Every person who, with intent to defraud, signs the name of another person, . . . *knowing that he has no authority so to do*, to . . . any . . . check . . . is guilty of forgery.' " (*Parker*, *supra*, at pp. 511-512.) The *Parker* court surmised that this amendment was intended to abrogate the holding in *Bendit* "that an unauthorized agency endorsement did not constitute forgery." (*Parker*, *supra*, at p. 511.)

25

Neither of these cases stand for the proposition that, so long as the *payee* is not defrauded, forging a payee's endorsement on a check is not, in fact, forgery. Landino was charged with forging the payee's endorsements on the business checks he made out to various third parties. He was not charged with presenting a counterfeit check, as in *Cole*. He was not charged with signing his own name on these checks without the authority to do so, as in *Bendit*. Section 470 does not specify that the purported forgery harm the person or entity whose signature was forged. All that is required is: (1) an intent to defraud;[12] (2) signing the name of another on a check; and (3) knowledge that one does not have the authority to sign that name. (§ 470, subds. (a), (d).) Landino seeks to introduce an *additional* requirement to section 470, namely that a forged signature must defraud the specific person or entity whose signature was forged. We will not rewrite the statute to add such a qualification.

Landino does not otherwise argue the evidence presented at trial was not sufficient, and we find that there was substantial evidence to support his conviction for forgery.

B.      *Failure to instruct on accomplice testimony*

Landino next argues that his conviction for embezzlement must be reversed because the trial court failed to instruct the jury: (1) that it should determine whether Rosario and Georgina were accomplices; and (2) if it found they were accomplices, it should view their testimony with caution, considering it only if it were corroborated by other evidence. We disagree.

Section 1111 provides that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it

---

[12] Section 8 provides: "Whenever, by any of the provisions of this code, an intent to defraud is required in order to constitute any offense, it is sufficient if an intent appears to defraud any person, association, or body politic or corporate, whatever."

26

merely shows the commission of the offense or the circumstances thereof." Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." A person is "liable to prosecution" for an offense (§ 1111), if he or she is a principal to that offense. (*People v. Lewis* (2001) 26 Cal.4th 334, 368-369 (*Lewis*).) Principals are "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ." (§ 31.)

"When there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices." (*People v. Frye* (1998) 18 Cal.4th 894, 965-966, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Whether a witness is an accomplice is a question of fact for the jury when the facts are disputed or susceptible to different inferences. (*People v. Valdez* (2012) 55 Cal.4th 82, 145-146.) However, if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony. (*Lewis*, *supra*, 26 Cal.4th at p. 369.)

In this case, the Spatolas could not be accomplices to Landino's embezzlement as a matter of law, and therefore the trial court had no duty to instruct the jury on accomplice testimony. We are not persuaded by Landino's argument that: (1) his embezzlement was simply (one of) the means by which he and Rosario deliberately and jointly sought to illegally avoid taxes; and (2) because Rosario and Georgina were, in his telling, accomplices to tax evasion, they were also necessarily accomplices to Landino's embezzlement.

27

The most glaring flaw in this argument is that if Rosario[13] was in fact aware of and approved Landino's diversion of partnership funds to his personal account, Landino cannot have committed embezzlement. "[W]here an individual honestly believes that he is authorized to appropriate and use property which he is accused of embezzling, the fraudulent intent which is a necessary element of that crime is absent." (*People v. Stewart* (1976) 16 Cal.3d 133, 139.) In this case, the jury was properly instructed on the elements of embezzlement, and was further instructed that it would be a defense to the crime if Landino held a "good faith belief" that he was "acting with authorization" in taking the property.

The final flaw in Landino's argument is "section 1111, by its terms, is offense-specific." (*People v. Felton* (2004) 122 Cal.App.4th 260, 273.) Accordingly, even if Rosario and Georgina were accomplices to tax evasion as Landino claims, the accomplice testimony instruction would be limited to any testimony they offered relating to *that* offense. A corollary to the offense-specific rule stated in section 1111 is that "a person who has committed a related but not identical offense need not be corroborated [citation], even though he or she may be trying just as hard as an accomplice would to curry favor or to shift blame." (*Felton*, *supra*, at p. 273.)

As a result, the trial court had no sua sponte duty to instruct the jury on accomplice testimony in relation to the charge of embezzlement.

---

[13] Georgina, who was not a party to the partnership agreement, could not have authorized Landino's diversion of funds, so it is theoretically possible that she was an accomplice to the embezzlement. However, Landino's testimony was that either *both* Rosario and Georgina knew and approved of what he was doing, or alternatively, *only* Rosario knew. Landino never testified or presented evidence that Georgina, but *not* Rosario, knew of his actions. Accordingly, the trial court need not have instructed the jury on the law of accomplices with respect to her testimony. (*Lewis*, *supra*, 26 Cal.4th at p. 369.)

28

*C.     Failure to sua sponte issue unanimity instruction*

Landino claims the trial court erred by not sua sponte issuing a unanimity instruction to the jury regarding the sentencing enhancements. He argues that because he offered unique defenses to the multiple transactions underlying the charges against him, the jurors should have been instructed that they had to unanimously agree on the specific transactions which taken together would trigger those enhancements. We find no merit in this argument.

We review claims of instructional error de novo to determine whether the trial court " 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) "In California, a jury verdict in a criminal case must be unanimous. [Citations.] Thus, our Constitution requires that each individual juror be convinced, beyond a reasonable doubt, that the defendant committed the *specific* offense he is charged with. [Citation.] Therefore, when the evidence suggests more than one discrete crime, either (1) the prosecution must elect among the crimes or (2) the trial court must instruct the jury that it must unanimously agree that the defendant committed the same criminal act." (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 569.)

"There are, however, several exceptions to this rule. For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when . . . the statute contemplates a continuous course of conduct or a series of acts over a period of time.' [Citation.] There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime." (*People v. Jennings* (2010) 50 Cal.4th 616, 679 (*Jennings*).)

Here, the court gave the jury the following unanimity instruction (CALCRIM No. 3500): "The People have presented evidence of more than one act to prove that the defendant committed each count and each allegation charged in the second amended

29

information.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."  "Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."  (*People v. Andrews* (1989) 49 Cal.3d 200, 218.)  Since Landino did not propose a different or additional unanimity instruction, he forfeited any claim of instructional error.  (*People v. Jackson* (1996) 13 Cal.4th 1164, 1228-1229 [failure to request an instruction waives the issue on appeal].)

However, even if we were to consider Landino's claim, it fails on the merits for at least two reasons.  First, Landino's actions constituted a "continuous course of conduct," and second, Landino offered the same defense to every discrete action.  (*Jennings*, *supra*, 50 Cal.4th at p. 679.)

A single count of embezzlement can consist of a cumulative series of fraudulent appropriations, and thus a continuous course of conduct, even though a single event could be the basis for a prosecution as well.  (Cf. *People v. Ewing* (1977) 72 Cal.App.3d 714, 717 [child abuse]; *People v. Howes* (1950) 99 Cal.App.2d 808, 818-819 [where evidence only of single intent to embezzle involving single victim, may aggregate for grand theft].)  With such a crime, where an information charges the occurrence of a single offense over a period of time (such as the information in the present case), the issue for a jury is whether a defendant is guilty of a *course of conduct*, not specific criminal acts.  (*People v. Napoles* (2002) 104 Cal.App.4th 108, 116 (*Napoles*).)  Here, Landino may have employed multiple means but his intent was singular:  to divert partnership funds from Giovanni's to his personal use.

Furthermore, Landino's assertion that he advanced "distinctive defenses . . . as to each category of alleged taking," is not borne out by either the evidence presented at trial or by defense counsel's final argument.  Landino's constant defense in this case was that

30

Rosario both knew and approved of what he was doing with the cash and the checks. His version of events was that he and Rosario were splitting all the money from the business, which allowed them both to avoid paying taxes on their true income.

Consistent with the evidence Landino presented during the trial, defense counsel argued to the jury: "What we're saying is Rosario . . . knew about how the checks were handled. Rosario . . . knew about the cash. It doesn't matter if those checks add up to [$]200,000 or [$]400,000, Rosario . . . received half of that money." A few minutes later, he said, "[r]emember, our fight is that everything that [Landino] did, he did with Rosario's knowledge."

When defense counsel addressed the elements of embezzlement, he directed the jury to look specifically at the third element: "The defendant fraudulently converted or used the property for his own benefit. It would be fraud if Rosario didn't know. If Rosario knew what was going on the cash or the checks, then it is not fraud." Turning to the forgery charge, defense counsel focused on the element of Landino's "authority to sign the name" arguing that "Rosario knew that [Landino] was going to do this" because "[Landino] was sharing with Rosario."

In concluding, defense counsel reiterated that in order to convict Landino, the jurors would "have to find that the Spatolas are credible, credible witnesses. Believable. You are going to have to ignore all of the evidence that . . . showed that they cannot be believed."

In this case, the "central dispute involved a credibility contest" (*Napoles*, *supra*, 104 Cal.App.4th at p. 121) and though the jury was entitled to believe either side, there was "no reasonable possibility that the jurors partially believed each and disagreed on the" (*ibid*.) commission of specific acts constituting the charged offenses. Having found Landino guilty, it is clear the jury did not believe that "everything that [Landino] did, he did with Rosario's knowledge."

31

*D.    Section 654*

Finally, Landino argues the trial court erred by not making a section 654 finding on his convictions for embezzlement and forgery. The Attorney General responds that this claim is unripe, because the trial court suspended imposition of sentence and placed Landino on probation. We agree with the Attorney General.

Section 654, subdivision (a), provides in pertinent part: "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) "The purpose of this statute is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.)

In *People v. Wittig* (1984) 158 Cal.App.3d 124 (*Wittig*), the defendant claimed he had been subjected to double punishment in violation of section 654 in receiving concurrent sentences for assault with a deadly weapon and shooting at an occupied vehicle. (*Wittig*, *supra*, at p. 137.) However, the trial court had in fact suspended imposition of sentence and placed the defendant on three years' probation on the condition that he serve 90 days in jail. (*Id*. at pp. 126-127.) The court rejected the defendant's section 654 challenge on appeal: "Imposition of sentence was suspended; each defendant was granted probation as to each offense. Because sentence was not imposed on either defendant, there is no double punishment issue. The section 654 issue should be presented to a court upon any future attempt to impose a double punishment upon either of these defendants in the event of a probation violation." (*Wittig*, *supra*, at p. 137; see also *People v. Lofink* (1988) 206 Cal.App.3d 161, 168.)

Landino argues that *Wittig*, *supra*, 158 Cal.App.3d 124 fails to give enough weight to "the interests of both fairness and judicial economy" and urges that we decline to follow its reasoning. In his view, "[n]o one is better situated to make this decision [i.e., the section 654 finding] than the trial judge; and there is no better time for such a determination than at the initial sentencing hearing, when the matter is still fresh in the mind of the trial court, as well as counsel for the defendant and the government."

We believe the reasoning of *Wittig* is sound and see no reason to reject it. While it is conceivable that in some instances, the judge revoking probation and imposing sentence will be different from the judge who initially tried the case and granted probation, this does not justify applying section 654 to circumstances to which the statute plainly does not apply. There is no punishment to be *stayed* in this case, because no punishment has been *imposed*.[14] The application of section 654 to his convictions is a theoretical concern.

For these reasons we conclude Landino may not raise a section 654 claim unless and until he violates probation and is sentenced by the court on his convictions.

III. **DISPOSITION**

The probation order is affirmed.

---

[14] Of course, if Landino successfully completes probation, no punishment will ever be imposed.

_____

            Premo, Acting P.J.

WE CONCUR:

_____

       Elia, J.

_____

       Grover, J.

People v. Landino
H044899